1   JEFFREY K. GARFINKLE (SBN 153496)
        jgarfinkle@buchalter.com
2   RICHARD P. ORMOND (SBN: 207442)
        rormond@buchalter.com
3   MATTHEW L. SEROR (SBN: 235043)
        mseror@buchalter.com
4   BUCHALTER NEMER
    A Professional Corporation
5   1000 Wilshire Boulevard, Suite 1500
    Los Angeles, CA 90017-2457
6   Telephone: (213) 891-0700
    Facsimile: (213) 896-0400
7
    Attorneys for Plaintiff
8   Joint Equity Committee of Investors

9              UNITED STATES DISTRICT COURT

10    CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

11  JOINT EQUITY COMMITTEE OF       Case No.  CV08-08551 SJO (RNBx)
    INVESTORS OF REAL ESTATE
12  PARTNERS, INC. AND ITS          COMPLAINT FOR:
    RELATED ENTITIES
13                                  1. Violation of Federal Securities Law
              Plaintiff,            § 10(b) and Rule 10b-5;
14
          vs.                       2. Violation of Federal Securities Law
15                                  §§ 12(a)(1) and 12(a)(2);
    DAWSON L. DAVENPORT, an
16  individual; THOMAS THOMPSON,    3. Violation of California Securities Law
    an individual; MICHAEL          § 25000, et seq.;
17  P. OWENS, an individual;
    DONALD G. RYAN, an individual;  4. Fraud;
18  JOHN ITZEL, an individual;
    ROURKE J. OAKLAND, an           5. Negligent Misrepresentation;
19  individual; JAIRAM PAI, an
    individual; BRENT PAYNE, an     6. Conspiracy to Defraud;
20  individual; ROBERT WARREN, III,
    an individual; THE ESTATE OF    7. Unfair Business Practices § 17200;
21  KEVIN RUSSELL, a deceased
    individual; GREGORY SMITH, an   8. False Advertising § 17500;
22  individual; BOWEN JONES, an
    individual; GREG GARMON, an     9. Misappropriation;
23  individual; RANDAL MATSON, an
    individual; THOMPSON REAL       10. Conversion;
24  ESTATE GROUP, a California
    corporation; PINE MOUNTAIN      11. Unjust Enrichment/Disgorgement;
25  CORPORATION, a California
    corporation; NETWORK REAL       12. Constructive Trust; and
26  ESTATE, a California corporation;
    PRINCIPLE MANAGEMENT            13. Appointment of Receiver.
27  GROUP, a California corporation;
                       Continued    DEMAND FOR JURY TRIAL
28

1   R.W. MATSON, INC., a California
    corporation; REAL ESTATE
2   PLACEMENT, INC., a California
    corporation; TKJ, INC., a California
3   corporation and DOES 1-100

4          Defendants.

5

6          The duly appointed Joint Equity Committee of Investors ("Plaintiff") of

7   Real state Partners, Inc. ("REP") and its related entities, debtors in the matter

8   entitled: *In re Real Estate Partners, Inc., and its Related Entities*, now pending in

9   the United States Bankruptcy Court for the Central District of California –

10  Santa Ana Division (the "Bankruptcy Court"), Case No. 8:07 – 13239 TA, jointly

11  administered with Case Nos. 8:07-13239 TA through 8:07-13246 TA, pursuant to

12  Order of the Bankruptcy Court (the "Bankruptcy Actions"), brings this action

13  against those persons that were responsible for, and that actively participated in, the

14  conspiracy to defraud Plaintiff (and its members) through a complex real estate

15  securities investment scheme.

16                      **JURISDICTION AND VENUE**

17         1.    Jurisdiction of this Court is proper and exclusive under 28 U.S.C.

18  § 1331, The Securities Exchange Act of 1934, and under the Securities Act of 1933.

19  Jurisdiction is proper as to the second through thirteenth causes of action pursuant

20  to 28 U.S.C. § 1367, in that these causes of action are transactionally related and

21  factually interdependent with the claims for which jurisdiction is afforded under

22  28 U.S.C. § 1331.

23         2.    Under 15 U.S.C. § 78aa venue is proper pursuant to The Securities

24  Exchange Act of 1934 and pursuant to 15 U.S.C. § 77v of the Securities Act of

25  1933. Venue is proper in any District where the transactions occurred and the

26  transactions alleged herein all occurred within this district.

27  ///

28  ///

**SUMMARY**

3.      Beginning in January of 2003, and continuing until August 2006, the Defendants, and each of them, actively participated in a scheme to defraud approximately 1600 "investors" (or as more aptly stated "Victims") from around the United States. Defendants' scheme, which was premised on the sale of unregistered securities, defrauded the Victims of REP, and its related investment funds, out of over fifty million dollars, which the Victims were informed would be used to acquire and manage real estate investment properties throughout the United States.

4.      Most of the Defendants participated in the fundraising process, by selling "interests" in one of seven investment funds ("Offerings" or "Investment Funds") of REP. While the interests in the Offerings that Victims purchased were securities, REP and the Defendants that participated in the fundraising efforts did not register the Offerings with the Securities & Exchange Commission, as required by Section 5 of the Securities Act, 15 U.S.C. § 77e.

5.      Victims were lured with promises of substantial returns, and little (if any) risk. However, the house of cards constructed by the Defendants soon toppled, leaving REP and the Investment Funds in bankruptcy and its Victims empty handed. The downfall of REP and the loss of the Victims' money was not a result of fluctuations in the economy or market. Rather, it was the inevitable result of the Defendants' scheme to defraud Victims by: (i) misrepresenting the material terms of the investments; (ii) misappropriating the Victim's monies; (iii) engaging in endless self-dealing; and (iv) the payment of extravagant commissions to the Defendants.

**PARTIES**

6.      Plaintiff is the duly appointed Joint Equity Committee in the Bankruptcy Actions pursuant to Order of the Bankruptcy Court.

///

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

7.      Defendant Dawson L. Davenport ("Davenport") is a resident of Lake Forest, California.  Davenport was one of the original four incorporators of REP, and at all times relevant hereto served on REP's Board of Directors. Moreover, for the majority of the time that REP and the Defendants were actively engaged in its fraudulent activities, Davenport served as REP's President and Chief Executive Officer.

8.      Defendant Thomas Thompson ("Thompson") is a resident of Orange County, California.  Thompson was one of the original four incorporators of REP and, at all times relevant hereto, served on REP's Board of Directors. Moreover, at various times during the course of REP's fraudulent scheme, Thompson served as REP's President.

9.      Defendant Thompson Real Estate Group ("Thompson Real Estate") is a California Corporation.  Plaintiff is informed and believes, and on that basis alleges, that at all times relevant hereto, Thompson Real Estate was an alter ego of Thompson.

10.      Defendant Michael P. Owen ("Owens") is a resident of Newport Coast, California.  Owens ran REP's fundraising operation which sold units in REP's seven Investment Funds.  Owens was paid by REP through REP's payments to Owens' two companies, Pine Mountain Capital Corporation and Network Real Estate Corporation.  Plaintiff is informed and believes, and on that basis alleges, Owens is not registered with the Securities and Exchange Commission as a broker or dealer.

11.      Defendant Pine Mountain Capital Corporation ("Pine Mountain") is a California corporation. Plaintiff is informed and believes that at all times relevant hereto, Owens was the President of Pine Mountain.  Pine Mountain was retained by REP as a consultant to implement and oversee REP's fundraising efforts.

12.      Defendant Network Real Estate ("NRE") is a California Corporation. Plaintiff is informed and believes, and on that basis alleges, that at all times relevant

1   hereto, Owens was the President of NRE.  NRE was retained by REP as a

2   consultant to implement and oversee REP's fundraising efforts.

3       13.    Plaintiff is informed and believes, and on that basis alleges, that at all

4   times relevant hereto, Pine Mountain and NRE were alter egos of Owens.

5       14.    Defendant Donald G. Ryan ("Ryan") is a resident of Irvine, California.

6   Ryan oversaw REP's fundraising operations which sold units in some of REP's

7   seven Investment Funds.  Ryan was paid fundraising commissions through his

8   company, Principle Management Group. Plaintiff is informed and believes, and on

9   that basis alleges, Ryan is not registered with the Securities and Exchange

10  Commission as a broker or dealer.

11      15.    Defendant Principle Management Group ("PMG") is a Nevada

12  corporation formed in 2001.  Plaintiff is informed and believes, and on that basis

13  alleges, that Ryan is and was the sole principle of PMG.  PMG was retained by

14  REP as a consultant to participate in REP's fundraising efforts.  Plaintiff is

15  informed and believes, and on that basis alleges, that at all times relevant hereto,

16  PMG was an alter ego of Ryan.

17      16.    Defendant John Itzel ("Itzel") is a resident of Orange County,

18  California.  Itzel was employed by REP and, at various times relevant hereto, sat on

19  REP's Board of Directors.  Plaintiff is informed and believes, and on that basis

20  alleges, that Itzel was responsible for identifying and overseeing REP's property

21  acquisitions.

22      17.    Plaintiff is informed and believes, and on that basis alleges, that

23  Defendant Rourke J. Oakland ("Oakland") is a resident of Orange County,

24  California.  Oakland actively participated in the fundraising operations which sold

25  units in REP's seven Investment Funds.  Oakland worked with and under the direct

26  supervision of Owens.  Oakland was paid fundraising commissions through

27  payments to Oakland's company, Real Estate Placement, Inc.  Plaintiff is

28  ///

1   informed and believes, and on that basis alleges, Oakland is not registered with the

2   Securities and Exchange Commission as a broker or dealer.

3        18.   Defendant Real Estate Placement, Inc. ("RE Placement") is a

4   California Corporation.  Plaintiff is informed and believes, and on that basis alleges

5   that Oakland is and was the sole principle of RE Placement.  Plaintiff is further

6   informed and believes, and on that basis alleges, RE Placement was retained by

7   Owens, Pine Mountain, NRE and/or PMG to participate in REP's fundraising

8   efforts.

9        19.   Plaintiff is informed and believes, and on that basis alleges, that at all

10  times relevant hereto, RE Placement was an alter ego of Oakland.

11       20.   Plaintiff is informed and believes, and on that basis alleges, that

12  Defendant Jairam Pai ("Pai") is a resident of Orange County, California.  Pai

13  actively participated in the fundraising operations which sold units in REP's seven

14  Investment Funds.  Pai worked with and under the supervision of Owens.  Pai was

15  paid fundraising commissions through payments to his company, TKJ, Inc.

16  Plaintiff is informed and believes, and on that basis alleges, Pai is not registered

17  with the Securities and Exchange Commission as a broker or dealer.

18       21.   Defendant TKJ, Inc. ("TKJ") is a California Corporation.  Plaintiff is

19  informed and believes, and on that basis alleges that Pai is and was the sole

20  principle of TKJ.  Plaintiff is further informed and believes, and on that basis

21  alleges that TKJ was retained by Owens, Pine Mountain, and/or PMG to participate

22  in REP's fundraising efforts.

23       22.   Plaintiff is informed and believes, and on that basis alleges, that at all

24  times relevant hereto, TKJ was an alter ego of Pai.

25       23.   Plaintiff is informed and believes, and on that basis alleges, that

26  Defendant Brent Payne ("Payne") is a resident of Orange County, California.  At

27  various times hereto, Payne worked with and under the supervision of Owens, Pai

28  and Oakland selling units in the Investment Funds.

1       24.    Plaintiff is informed and believes, and on that basis alleges, that

2   Defendant Robert Warren, III ("Warren") is a resident of Orange County,

3   California.  At various times relevant hereto, Warren participated in the acquisition

4   and management of the various properties acquired, owned and/or operated by REP

5   and the REP Investment Funds.

6       25.    Plaintiff is informed and believes, and on that basis alleges, that

7   Defendant The Estate of Kevin Russell ("Russell") is the duly formed probate

8   estate of Kevin Russell, a deceased individual who resided in Orange County,

9   California.

10       26.    Plaintiff is informed and believes, and on that basis alleges, that

11   Defendant Gregory Smith ("Smith") is a resident of Orange County, California.

12   Plaintiff is informed and believes, and on that basis alleges, that at various times

13   relevant hereto, Smith participated in the acquisition and management of the

14   various properties acquired, owned and/or operated by REP and the REP

15   Investment Funds.

16       27.    Plaintiff is informed and believes, and on that basis alleges, that

17   Defendant Bowen Jones ("Jones") is a resident of Orange County, California.

18   Plaintiff is informed and believes, and on that basis alleges, that at various times

19   relevant hereto, Jones participated in the acquisition and management of the various

20   properties acquired, owned and/or operated by REP and the REP Investment Funds.

21       28.    Plaintiff is informed and believes, and on that basis alleges, that

22   Defendant Greg Garmon ("Garmon") is a resident of Orange County, California.

23   Plaintiff is informed and believes, and on that basis alleges, that at various times

24   relevant hereto, Garmon participated in the acquisition and management of the

25   various properties acquired, owned and/or operated by REP and the REP

26   Investment Funds.

27       29.    Defendant Randal Matson ("Matson") is a resident of Orange County,

28   California.  Matson worked with Owens, Pine Mountain and NRE as a bookkeeper.

30.     Defendant R.W. Matson, Inc. ("R.W. Matson") is a California Corporation.  Plaintiff is informed and believes, and on that basis alleges, that Matson is the sole principle of R.W. Matson.

31.     Plaintiff is informed and believes, and on that basis alleges, that at all times relevant hereto, R.W. Matson was an alter ego of Matson.

32.     Plaintiff is ignorant of the true names and capacities of those defendants sued herein as DOES 1 to 50, and therefore sues these defendants by those fictitious names.  On information and belief, DOES 1 through 50 are, and at all times herein mentioned were, corporations, partnership, or other business entities, which are responsible in some manner for the acts alleged herein which proximately caused the injuries complained of herein.  Plaintiff is ignorant of the true names and capacities of those defendants sued herein as DOES 51-100, and therefore sues these defendants by those fictitious names.  On information and belief, DOES 51-100 are, and at all times herein mentioned were, individuals who are responsible in some manner for the acts alleged herein which proximately caused the injuries complained of herein.  Plaintiff will seek leave to amend this Complaint to allege the true names and capacities of DOES 1 to 100 when the same have been ascertained (Davenport, Thompson, Thompson Real Estate, Owens, Pine Mountain, NRE, Ryan, PMG, Itzel, Oakland, RE Placement, Pai, TKJ, Payne, Warren, Smith, Jones, Matson, R.W. Matson, and DOES 1-100, collectively, "Defendants").

33.     Plaintiff is informed and believes, and based thereon alleges, that each of the Defendants was, and is, the agent, partner, joint venturer and co-conspirator of each of the other Defendants, and all of the things alleged to have been done by said Defendants were done in the capacity of and as agent, partner, joint venturer and co-conspirator of the other Defendants.  Plaintiff is further informed and believes, and based thereon alleges, that Defendants are the alter egos of one another.

## FACTUAL BACKGROUND

34.   Between January 2003 and August 2006, REP, by and through the Defendants herein enticed the approximately 1600 Victims to invest millions of dollars in unregistered securities, which were presented as real estate investment vehicles. These investments were touted by Defendants as a way for the average Victim to take advantage of the then-booming real estate market.

35.   The presentation to the Victims was straightforward. Each "potential" Victim was given the opportunity to purchase units, priced at $10,000 per unit, in an Investment Fund. Each unit purchased would give the investor an ownership interest in a particular Investment Fund (of which there were seven). The Victims were told that REP, in concert with the Defendants, would use the Victims' money invested in an Investment Fund for the acquisition of real estate investment properties across the United States.

36.   Victims were told that REP and its staff had significant experience in the acquisition, renovation and sale of "below market" properties. Victims were told that due to REP's experience in real estate investments, the Victims could expect substantial returns on their investments when REP renovated the properties and either held them or sold them for a claimed significant gain.

37.   Over the course of its fundraising efforts, REP, and Defendants participated in the fundraising of units in seven distinct investment funds or offerings. The first five Offerings, named: INCOME FUND I; INCOME FUND II; INCOME FUND III; UNIT INVESTMENT BUSINESS TRUST I; and UNIT BUSINESS INVESTMENT BUSINESS TRUST II, sought to each raise $5 million from investors. The final two Offerings, the EQUITY FUND and the GROWTH FUND each originally sought to raise $7.5 million from investors, but were eventually doubled to $15 million apiece. All told, approximately, $55 million was raised from approximately 1600 victims. Plaintiff is informed and believes that REP and the Defendants used Victims' money to buy and sell at least 20 real

1   properties from across the United States.  These transactions did not create any

2   benefit to the Victims despite significant "commissions" paid to many of the

3   Defendants.

4       38.    The Defendants created a complex and multi-faceted operation to

5   solicit and sell units of the Investment Funds. This included a hierarchy of

6   managers and supervisors, which included the highest ranking executives of REP

7   and its related entities, who oversaw a network of callers (the "Callers") who cold

8   called the Victims.

9       39.    Callers were divided into two classes, "Fronters", who made the initial

10   contact with a potential Victim with a cold call, and "Closers", who followed up

11   with the potential Victims and worked to secure the funds.

12       40.    Davenport and Owens jointly oversaw all aspects of the fundraising

13   efforts, including the responsibility for establishing and managing the effort to raise

14   capital for REP through direct solicitations of Victims.

15       41.    The process by which Victims were solicited, was premised on a

16   number of material misrepresentations made to Victims, which were made both

17   orally and in writing.  These representations were specifically put into place by

18   Davenport, Owens and others, to deceive Victims into purchasing units in the

19   Investment Funds.

20       42.    Davenport, Owens, Ryan, Payne, Oakland, Pai and other

21   representatives of Pine Mountain, NRE, PMG, TKJ, and RE Placement made the

22   following misrepresentations to Victims, either by directly speaking to the Victim,

23   mailing a potential Victim the misrepresented solicitation materials, or by

24   instructing other Defendants to make these misrepresentations to the potential

25   Victims:

26       a.      The misrepresentation of a relationship between REP, the

27   Investment Fund and Coldwell Banker Commercial;

28   ///

1           b.       The misrepresentation as to the source and duration of promised

2   "dividends" to be paid to the investors during the first two years of the investors'

3   investment;

4           c.       The misrepresentation as to the potential investment returns that

5   investors could expect;

6           d.       The misrepresentation of the risk associated with each

7   Investment Fund; and

8           e.       The misrepresentation as to how investors' funds would be

9   spent, including the percentages that could be paid for commissions and related fees

10   and the percentage that would be used for the acquisition of the investment

11   properties.

12       43.    Unfortunately, for the approximately 1600 Victims, the deception went

13   undetected until too late and the Victims lost over $55 million.

14   **A.**    **THE ESTABLISHMENT OF TWO BOILER-ROOMS FROM**

15          **WHICH INVESTMENTS WERE SOLICITED**

16       44.    The first, and most important, aspect of the Defendants' fraudulent

17   scheme was to get Victims to invest in the various Investment Funds.  In or about

18   late 2002, Davenport contracted with Owens to coordinate raising monies for the

19   Investment Funds.  Both worked, in concert, to implement, oversee and manage all

20   aspects of the fund-raising efforts.

21       45.    Payne, Oakland and Pai, under the supervision of Davenport, Owens,

22   and Ryan, offered and sold the Offerings through two well organized boiler-rooms

23   in Orange County, California.  The initial boiler-room was located in Santa Ana,

24   and was managed by Owens.  Subsequently, a second boiler-room, located in

25   Irvine, was established by Owens and operated by Ryan.

26       46.    Plaintiff is informed and believes, and on that basis alleges, that

27   Owens formed Pine Mountain and NRE to create a corporate "front" for the

28   Santa Ana boiler-room.  Plaintiff is also informed and believes, and on that basis

alleges, that Pine Mountain and NRE were formed strictly to shield Owens from personal liability from the fraudulent and illegal actions of Pine Mountain and NRE. Plaintiff is informed and believes, and on that basis alleges, that Pine Mountain and NRE were not legitimate business enterprises and were not engaged in other business operations besides the raising of investor money for REP, and the Investment Funds.

47.     Plaintiff is informed and believes, and on that basis alleges, that in a further effort to shield himself from personal liability and to distance himself from the fund-raising activities of Pine Mountain and NRE, Owens brought in Pai and Oakland to form new entities, which in turn would "manage" the day to day operations of the Santa Ana boiler-room. In fact, however, Owens continued to be the primary manager of the Santa Ana boiler-room and Pai and Oakland answered to Owens.

48.     Toward this end, and based on the instructions of Owens, Oakland formed RE Placement. Plaintiff is informed and believes, and on that basis alleges, that RE Placement existed solely for the purpose of selling units in the Investment Funds and was an attempt conceal the role of Owens, Pine Mountain, NRE and Oakland in the day-to-day operation of the boiler-rooms. Owens, Pine Mountain and NRE sub-leased to RE Placement the office space from which to conduct the fund-raising activities. There is no evidence that RE Placement ever paid rent for the office space sub-leased from Owens, Pine Mountain and/or NRE.

49.     Furthermore, based on the instructions of Owens, Pai formed TKJ. Plaintiff is informed and believes, and on that basis alleges, that TKJ existed solely for the purpose of selling units in the Investment Funds and was an attempt conceal the role of Owens, Pine Mountain, NRE and Pai in the day-to-day operation of the boiler-rooms. Owens, Pine Mountain and NRE sub-leased TKJ the office space from which to conduct the fund-raising activities. There is no evidence that TKJ

///

1  ever paid rent for the office space sub-leased from Owens, Pine Mountain and/or

2  NRE.

3      50.    Despite this additional layer of corporate fiction, and regardless of the

4  entity that claimed to be operating the Santa Ana boiler-room, Owens and

5  Davenport oversaw all aspects of the fundraising.  Owens remained the ultimate

6  decision maker and person in charge of both boiler-rooms.

7      51.    Plaintiff is informed and believes, and on that basis alleges, that

8  Owens, with the assistance, knowledge, and active participation of Davenport, was

9  responsible for, among other things: hiring, firing, and training the fundraising

10  force, setting the fundraising goals of the Santa Ana office, and paying vendors.

11  Owens would train the callers on how to solicit investments, would draft scripts to

12  be used by the callers, would advise callers on how to respond to Victim's

13  questions, would speak directly with Victims on occasion, would oversee the

14  preparation and mailing of promotional materials to potential Victims, and would

15  ensure the receipt of Victims' money once a respective Victim agreed to purchase

16  an interest in one of the Investment Funds.

17      52.    Income Fund I was the first Investment Fund offered to Victims by the

18  Santa Ana boiler-room.  Plaintiff is informed and believes, and on that basis alleges

19  that when units in one particular Investment Fund was being offered by the

20  Santa Ana boiler-room, all callers working at the Santa Ana boiler-room worked to

21  raise money for that particular fund until the maximum amount for that Investment

22  Fund was reached.

23      53.    Plaintiff is informed and believes, and on that basis alleges, that in or

24  about the Spring of 2003, Owens hired Ryan to assist in the fund-raising efforts on

25  behalf of REP.  Toward that end, Ryan formed PMG, to operate the Irvine boiler-

26  room.  Plaintiff is informed and believes, and on that basis alleges, that PMG was

27  not a legitimate business enterprise, and engaged in no other business operations

28  besides the raising of investor money for REP and the Investment Funds.

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 2485135v2                                    13

COMPLAINT

54.     Beginning with Ryan's arrival, REP, Davenport and Owens began conducting two concurrent Offerings, one sold primarily by the Santa Ana boiler-room, and one sold by the Irvine boiler-room. Owens' Santa Ana boiler-room was primarily responsible for offering and selling, in succession, interests in Income Fund I, Income Fund II, Income Fund III, and the Growth Fund. Ryan's boiler-room was primarily responsible for offering and selling interests in the Unit Investment Business Trust I, Unit Investment Business Trust II, and Equity Fund.

55.     Plaintiff is informed and believes, and on that basis alleges, that while Ryan managed the day-to-day operation of the Irvine boiler-room, Ryan reported to and took instructions from Davenport and Owens. Plaintiff is informed and believes, and on that basis alleges, that as was the case with the Santa Ana boiler-room, Owens, with the assistance, knowledge, and active participation of Davenport and Ryan, was responsible for, among other things: hiring, firing, and training the fundraising force, setting the fundraising goals of the Irvine office, and paying vendors. Just like in the Santa Ana boiler-room, Owens would train the callers on how to solicit investments, would draft scripts to be used by the callers, would advise callers on how to respond to Victim's questions, would speak directly with Victims on occasion, would oversee the preparation and mailing of promotional materials to potential Victims, and would ensure the receipt of a Victim's money once a Victim agreed to purchase an interest in one of the Investment Funds.

**B.     THE OPERATION OF THE BOILER-ROOMS**

56.     The fundraising efforts at both the Santa Ana and Irvine locations operated in a very similar manner. Both employed Fronters and Closers. The Fronters cold-called potential Victims and mailed them fundraising materials. Fronters utilized lead lists and misleading scripts to cold-call hundreds of potential Victims each day, enticing Victims with promises of lucrative returns based on the revenue generated from properties REP was purportedly purchasing and managing.

1    Once contact was made with a potential Victim, written solicitation materials were
2    sent to that Victim.  Materials that were misleading and false.

3        57.    The scripts used by the Fronters and Closers emphasized REP's
4    purported affiliation with Coldwell Banker, claiming that in the last eight years
5    REP was the third-largest Coldwell Banker franchise in the country.  Materials
6    prominently displayed the Coldwell Banker logo inferring and touting an affiliation
7    and tacit approval from Coldwell Banker of REP's solicitation of funds. The scripts
8    also touted REP's purported track record of successful real estate acquisitions and
9    the possibility of Victims receiving a return of ten times their initial investment.
10   These representations proved to be false.

11       58.    Plaintiff is informed and believes, and on that basis alleges that
12   Fronters were expected to make as many cold-calls as possible to potential Victims.
13   Potential Victims were identified on investor lead lists provided to the Santa Ana
14   and Irvine boiler-rooms by REP and Davenport.  It is believed that REP spent
15   thousands of dollars each week purchasing these leads.

16       59.    Once a Fronter made contact with a potential Victim and mailed the
17   Victim the solicitation materials, the Closer would follow up with the potential
18   Victim to answer any questions about the Investment Funds and to close the deal.

19       60.    Fronters and Closers were directly trained by Owens, Ryan and
20   Davenport.  Specifically, Davenport would go to the Santa Ana offices to talk with
21   the Fronters and Closers when a new Investment Fund was formed.  Any Victim
22   question that could not be answered by a Fronter or Closer was directed to either
23   Owens or Davenport.  Owens had frequent meetings with the Fronters and Closers
24   to discuss any Victim's questions or other issues that the Fronters and Closers
25   encountered.

26       61.    Owens was also responsible for setting fundraising quotas for the
27   Fronters and Closers, and would fire any Fronter or Closer who Owens felt was
28   performing well, even if the Fronter or Closer was not directly employed by

1   Owens, Pine Mountain or NRE, demonstrating the reality that these corporate

2   entities were merely fictions.  Owens frequently "walked the floor" of the Santa

3   Ana boiler-room to directly oversee the Fronters and Closers while on the phone

4   with Victims.  To aid him in his oversight of the Fronters and Closers, Owens

5   installed closed circuit video cameras in the Santa Ana boiler-room so he could

6   effectively oversee and supervise the work of the Fronters and Closers.

7          62.    When it came to training the Fronters and Closers, Owens and

8   Davenport encouraged them to be aggressive.  Owens urged the Fronters and

9   Closers to stress the misleading relationship between REP, the Investment Funds

10  and Colwell Banker.  Plaintiff is also informed and believes, and on that basis

11  alleges, that Owens urged the Fronters and Closers to dissuade the potential

12  Victims from reading the solicitation materials, including the PPM.  Owens was

13  well known for saying, "Readers Never Invest, Investors Never Read."

14         63.    In consideration of Owens' efforts in raising investor funds for REP

15  and the Investment Funds, and overseeing the fundraising efforts, Plaintiff is

16  informed and believes, and on that basis alleges, that REP paid Owens, by and

17  through Pine Mountain and NRE, 35% of monies raised by the Santa Ana office,

18  less whatever fundraising costs REP provided in advance.  Owens' companies also

19  received 18% of the funds raised by the Irvine boiler-room as compensation for his

20  oversight and supervision of that office.  In total, Owens' companies received

21  $10.9 million, or 21% of the monies raised from the Offerings.  The Santa Ana

22  Fronters were paid commissions of up to 5%, and the Closers were paid at least

23  10%, but could make more based upon certain office volume incentives.  These

24  payments amounted to millions of dollars.

25         64.    In consideration for his work in raising investor funds for REP,

26  Plaintiff is informed and believes, and on that basis alleges, that REP and/or

27  Owens, Pine Mountain or NRE, paid Ryan, by and through PMG, 40% of the

28  monies raised by the Irvine boiler-room.  Ryan used the money to pay commissions

1  to his fundraisers and himself, as well as to pay all other fundraising expenses.

2  Ryan's company, PMG, netted a total of $3,081,607, or approximately 10% of the

3  $29 million raised by the Irvine office.

4      **C.**    **<u>MISREPRESENTATIONS WERE MADE TO POTENTIAL</u>**

5               **<u>INVESTORS BOTH ORALLY AND IN WRITTEN</u>**

6               **<u>SOLICITATION MATERIALS</u>**

7      65.    Throughout the solicitation process, Davenport, Thompson, Owens,

8  Payne, Ryan, Oakland, Pai and other representatives of REP, Pine Mountain, NRE,

9  PMG, RE Placement and TKJ acted in concert to cause certain misrepresentations

10  and omissions of material fact to be made to potential Victims regarding the

11  Investment Funds. These misrepresentations were made both orally and in the

12  written solicitation materials sent to potential Victims.

13      66.    Plaintiff is informed and believes, and on that basis alleges, that

14  Davenport, Thompson, Owens, Payne, Ryan, Oakland, Pai, and other

15  representatives of Pine Mountain, NRE, PMG, RE Placement and TKJ made the

16  misrepresentations identified in Paragraph 42, 56 AND 57 herein, directly to

17  Victims and instructed the Fronters and Closers working at the Santa Ana and

18  Irvine boiler-rooms to make these

19  misrepresentations to Victims so as to induce them to invest in the Investment

20  Funds.

21      67.    The oral misrepresentations occurred during phone calls with Victims,

22  when Fronters, Closers, Owens, Ryan, Payne, Oakland, Pai and other

23  representatives of Pine Mountain, NRE, PMG, RE Placement and TKJ made

24  misrepresentations as detailed in Paragraph 42, 56 AND 57.

25      68.    Written misrepresentations were contained in solicitation packages that

26  were sent to potential Victims by Owens, Ryan, Payne, Oakland, Pai and other

27  representatives of REP, Pine Mountain, NRE, PMG, RE Placement and TKJ.

28  ///

69.     The packages sent to Victims contained glossy brochures that summarized the Investment Funds, a glossy REP quarterly newsletter featuring a "message" from Davenport and Thompson, a copy of the Investment Fund's private placement memorandum, a subscription agreement, a purchaser questionnaire, and, in case the Victim wanted to invest in the Offering using their retirement funds, as several did, an IRA application, and other solicitation materials.

70.     The glossy fundraising brochures and the materials sent along with those brochures to potential Victims were created by Davenport, Thompson, Owens, and an outside marketing consultant. The fundraising brochures contained information regarding REP, its management, and descriptions of properties the company purportedly owned or managed.

71.     The glossy fundraising brochures also contained statements of Thompson regarding REP, its management, and the potential investment acquisitions.  Plaintiff is informed and believes, and on that basis alleges, Thompson knew the statements attributed to him were untrue and inaccurate, and nevertheless approved their inclusion in the brochures to induce potential Victims to invest in the REP Investment Funds.

**D.      MISREPRESENTATIONS REGARDING THE AFFILIATION BETWEEN REP AND COLDWELL BANKER COMMERCIAL**

72.     One of the misrepresentations made to potential Victims concerned the reported relationship between REP, the Investment Funds and Coldwell Banker Commercial ("Coldwell Banker")

73.     The Fronters, Closers, Owens, Ryan, Oakland, Pai, Payne and other representatives of Pine Mountain, NRE, PMG, RE Placement and TKJ stressed, both orally and in writing, the purported affiliation between REP, the Investment Funds, and Coldwell Banker.  During training sessions with Fronters and Closers, Davenport and Owens emphasized this relationship and instructed the Fronters and Closers to emphasize the relationship to investors.

74.     Up until early 2006, the written materials sent to potential Victims highlighted the REP and the Investment Funds purported affiliation with Coldwell Banker.  Specifically, the Coldwell Banker logo appeared either at the top of every page or on the first and last page of the fundraising brochures alongside REP's corporate logo, or on several pages of the brochure.

75.     In an attempt to raise money for the Investment Funds, the materials misrepresented the relationship between Coldwell Banker and REP and stated that the Investment Funds offer investors "the safety and security of investing in real estate," and that "By leveraging the proven track record of Coldwell Banker Commercial, one of the oldest names in real estate, investors can rest comfortably knowing their investment is being managed with a focus on safety and growth."

76.     Unbeknownst to the potential Victims, these representations were false.  The truth was that Coldwell Banker had nothing to do with the Investment Funds.  Rather, Orange Coast Commercial, Inc. ("OCC"), a real estate brokerage firm controlled by Davenport and 20% owned by REP, was a Coldwell Banker franchise.  The OCC franchise used a number of d/b/a's, including Real Estate Partners.  Plaintiff is informed and believes, and on that basis alleges, that Coldwell Banker did not grant the use of its name or logo in any of the REP Investment Fund materials, as was required by the franchise agreement that Davenport signed on behalf of OCC.  Furthermore, rather than being the third largest Coldwell Banker franchise, as the fundraisers told potential Victims, Plaintiff is informed and believes that the OCC franchise was actually among the lowest ten percent in performance among the thousands of Coldwell Banker franchises nationwide.

77.     Nevertheless, the purported affiliation remained a vital feature of the solicitations for the Investment Funds. Fronters often began their presentation to Victims by announcing that they were calling from "Coldwell Banker Commercial Real Estate Partners."  The fundraising scripts, written by Owens, Davenport, and others, and read by the Fronters, stated that in the last eight years REP operated "the

1    third largest Coldwell Banker franchise" in the country.  The Coldwell Banker

2    name was also prominently featured in the Offering fundraising brochures,

3    appearing at the top of each page of some of the brochures (Income Fund II;

4    Income Fund III, Unit Investment Business Trust I and Unit Investment Business

5    Trust II solicitations), or on the first and last page of the fundraising brochures

6    (Equity Fund and Growth Fund), and alongside REP's corporate logo, or on several

7    pages of the Income Fund I brochure.

8           78.    Plaintiff is informed and believes, and on that basis alleges, that

9    Davenport, Owens, Payne, Ryan, Oakland, Pai, and other representatives of Pine

10   Mountain, NRE, PMG, RE Placement and TKJ provided the name and number of

11   an alleged representative at Coldwell Banker to serve as a reference for the REP

12   Investment Funds.  In so doing, these defendants intended for Victims to rely on the

13   Coldwell Banker relationship.

14          79.    Also undisclosed to Victims, on or about September 9, 2004, Coldwell

15   Banker sent Notices of Intent to Terminate its franchise agreement with Coldwell

16   Banker Commercial REP.  By letter dated November 23, 2004, Coldwell Banker

17   informed REP's counsel that REP remained "in material breach" of the franchise

18   agreement.  The letter states:

19               Your client may not utilize its Coldwell Banker Commercial

20               franchise to generate business for and to expand Real Estate

21               Partners, Inc.  Nonetheless, that is exactly what is

22               occurring . . . . Real Estate Partners, Inc. should be maintained

23               completely separate from the franchise but it is not. [Emphasis

24               in original]

25          80.    The letter further states:

26               A third example of your client's violation of the Franchise

27               Agreement is evidences in another promotional piece it

28               disseminated . . . . It is wholly misleading to the public and

1    potential investors to suggest that Real Estate Partners has

2    "access to a network of over 300 affiliate offices" or to suggest

3    that Real Estate Partners should somehow benefit from

4    Coldwell Banker's reputation and history in the real estate

5    industry.

6    81.    With regard to use of the Coldwell Banker Commercial logo, the letter

7    warns:

8    [N]or may your client or the owners use any of the marks or any

9    part of the Coldwell Banker System.  The mere act of allowing

10    other businesses to use an email address for "cbcrep.com" is a

11    violation of Coldwell Banker's identity standards.

12    82.    Despite Coldwell Banker's termination of OCC's franchise in late

13    2005, and Coldwell Banker's instructions not to use any of its trademarks, REP

14    continued to use the Coldwell Banker logo in offering fundraising materials into

15    2006.  Specifically, versions of the Equity Fund and Growth Fund brochures, sent

16    to Victims as late as April 2006, featured the Coldwell Banker logo at the top of the

17    first and last page of the brochures.  These brochures were approved by Davenport

18    and Owens.  Furthermore, as late as January 2006, the dividends Victims received

19    were paid by checks that read "Real Estate Partners, Inc. DBA Coldwell Banker

20    Commercial REP," thus perpetuating the misrepresentation that Coldwell Banker

21    was associated with REP.  These checks bore Davenport's signature.

22    83.    Notwithstanding his knowledge of the November 23, 2004

23    correspondence from Coldwell Banker and the termination of the Coldwell Banker

24    franchise in late 2005, it was not until November 8, 2006 that Davenport wrote a

25    letter to the Victims indicating that REP's relationship with Coldwell Banker had

26    ended.  In so notifying the Victims, however, Davenport falsely represented that

27    REP itself decided to "discontinue use of the Coldwell Banker Commercial

28    franchise name and its trademarks" because of "changes in the direction" Coldwell

1    Banker wanted to take.  Davenport assured the Victims, however, that "The change

2    has resulted in numerous [unspecified] positive benefits to REP and its investors."

3    This statement was false and misleading.

4        84.    Plaintiff is informed and believes, and on that basis alleges, that the

5    representations made to the Victims, both orally and in written solicitation materials

6    regarding the relationship between REP, the Investment Funds and Coldwell

7    Banker was material to the Victims' decision to invest in the Investment Funds.

8    **E.     MISLEADING STATEMENTS MADE TO THE INVESTORS**

9    **REGARDING THE USE OF INVESTOR FUNDS**

10       85.    The cornerstone of the written solicitation materials sent to potential

11   Victims was the Private Placement Memorandum ("PPM").

12       86.    Each offering had its own PPM, which was represented to include all

13   of the necessary details regarding the potential investment, including the use of

14   investor money, the limitations on such uses, the required disclosures, and all other

15   material terms of the Investment Fund.

16       87.    Plaintiff is informed and believes, and on that basis alleges that

17   Davenport, Owens, Ryan and others were responsible for drafting of the PPM for

18   each Offering.  Plaintiff is also informed and believes, and on that basis alleges, that

19   the PPM for each Investment Fund was reviewed and approved by Owens and

20   Davenport prior to being disseminated to potential Victims.

21       88.    Moreover, Plaintiff is informed and believes, and on that basis alleges,

22   that at least one attorney retained by Davenport and Owens to draft the PPM

23   warned them as to the illegality of presenting the PPM to potential investors in the

24   manner Davenport and Owens desired to draft the PPM.

25       89.    Instead of modifying the PPM and their business plan to come into

26   compliance with all applicable federal and state laws, including federal securities

27   law, Davenport and Owens retained a different attorney that was willing to draft the

28   PPM as Davenport and Owens requested.

90.    The PPM's described the purported planned use of investor funds. The Income Fund I PPM states that it is estimated that 10% of monies raised would be used for real estate acquisitions, 30% would be used to purchase on behalf of investors preferred stock in REP, and that no more than 10% would be used towards commissions and 1% towards offering expenses. The PPM further represents that the investment "may be" offered and sold by brokers registered with the Securities and Exchange Commission.

91.    The subsequent six Offerings used virtually identical PPM's. These PPM's state that it is estimated that 30% of the monies raised would be used for real estate acquisitions, 22% would be used to purchase preferred stock in REP on behalf of the investors, and no more than 15% of investor funds would be expended on "syndication fees and costs."

92.    In fact, undisclosed to the Victims, over $26 million, or over 52%, of the almost $50 million raised was paid to fundraisers and others as commissions on the sales of the units in the Investment Funds. These monies included payments of $10.9 million to Pine Mountain and NRE, the two companies controlled by Owens and over $3 million to PMG, the company controlled by Ryan. Other commissions to Fronters and Closers exceeded $11 million. Additionally, contrary to the representations in the Income Fund I PPM, none of the Defendants, Fronters or Closers were registered with the Commission as brokers or dealers.

93.    The representations made in the PPM to potential Victims were material to the Victims' decision to invest in the Investment Fund. The Victims relied upon the veracity of those representations, which were false.

**F.    MISLEADING STATEMENTS MADE TO THE INVESTORS REGARDING THE PAYMENT OF DIVIDENDS**

94.    Furthermore, in order to lull Victims into believing that their investments were in fact profitable and to encourage additional investments, the Investment Funds paid investors a 4% annual "dividend" (8% in the case of Income

Fund I) for up to two years after the initial date of investment.  Plaintiff is informed and believes, and on that basis alleges, that it was Owens' idea to make these dividend distributions to Victims.  The PPM's state that the source of these dividend payments would be "available revenue."  The purported dividend payments conveyed the misleading impression that the investments were profitable.  In actuality, the source of funds used to pay these "dividends" was a bank account funded almost entirely by Victims' money, which were being paid to Victims in a Ponzi-like scheme.  Rather than being profitable, Plaintiff is informed and believes, and on that basis alleges, that the Investment Funds incurred substantial losses.

95.   Davenport was aware of this misrepresentation made to Victims and participated in this misleading activity insofar as he signed the dividend checks sent to Victims, which were written on an account entitled "Real Estate Partners, Inc. DBA Coldwell Banker Commercial REP Investment Account".

## G.   MISLEADING STATEMENTS MADE TO THE INVESTORS REGARDING THE POTENTIAL RETURNS OF THE INVESTMENT FUNDS

96.   The fundraising brochures sent to potential Victims also contained two charts summarizing five year projected rates of return for the Investment Fund.  Since mid-2003, virtually identical charts appeared in all of the fundraising brochures.  One chart depicts year-by-year returns, starting with a 22.6% return in year one and ending with a 78.6% return in year five, with an average yearly return of 54% (Growth Fund and Equity Fund brochures) or 54.82% (Income Fund II, Income Fund III, Unit Investment Business Trust I and Unit Income Business Trust II brochures), and a cumulative return of 270% (Equity Fund and Growth Fund brochures) or 274 % (Income Fund II, Income Fund III, Unit Investment Business Trust I and Unit Investment Business Trust II brochures).  Also included in each of these brochures was a bar graph that shows the value of an initial investment of $20,000 growing to $194,000 after five years.  Plaintiff is informed and believes,

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

COMPLAINT

1   and on that basis alleges, that Davenport determined what "projections" would be

2   inserted into the fundraising brochures.

3       97.    These charts, created by Owens, Davenport, and a marketing

4   consultant, are misleading.  First, Plaintiff is informed and believes, and on that

5   basis alleges, that the projections, provided by Davenport, are not based upon any

6   actual performance of REP's investments.  Second, the year-by-year projection

7   chart is misleading because investors do not receive yearly returns on their

8   investments.  Rather, investors were told that profits from the sale of the properties

9   are re-invested into new properties.  The charts represented that the cycle of sale

10  and reinvestment in properties is to continue for five years.  However, the

11  projection chart, broken out by year, in combination with the quarterly dividend

12  payments, makes it seem as though there is a constant income stream to investors,

13  when this is not the case.  Finally, the charts do not account for the fact that only a

14  small percentage of investor funds were actually invested in real estate.  Thus, to

15  attain the rates of return projected in the Offering fundraising brochures, REP

16  would have to had generated a much higher annual return, every year for five years,

17  from the sales of the properties it purportedly acquired and sold.

18      98.    Plaintiff is informed and believes, and on that basis alleges, that

19  Davenport, Thompson, Owens, Ryan and others, knew these projections were

20  impossible given the siphoning off of Victim money for commissions and "fees"

21  and ownership interests in the property acquired.

22      99.    In addition to the foregoing, Plaintiff is informed and believes, and on

23  that basis alleges that Defendants misrepresented REP's and the Investment Funds'

24  ownership interest in the properties acquired.  Specifically, the Defendants

25  represented in newsletters, reports and other updates provided to the Victims that

26  REP and/or the Investment Funds wholly owned the real estate acquisitions.  In

27  reality, REP and/or the Investment Funds, in most instances, owned a mere 10%

28  interest, or less, of the acquired real estate.  The remaining equity interest were held

1    by an institutional lender and/or equity partner, whose involvement in the

2    acquisition of the real estate was not disclosed to the Victims.

3          100.   Victims were also told that REP was planning on "rolling-up" their

4    fund offerings into a publicly-traded Real Estate Investment Trust ("REIT").  With

5    the exception of the IF I brochure, each Offering's fundraising brochure represented

6    that "REITS command a multiple of approximately ten times revenue or greater,"

7    while some Victims were orally told that rolling up their funds into a REIT would

8    result in a return of up to twelve times the investors' initial investment. These

9    statements were false and misleading because, based on Plaintiff's information and

10   belief, REP in fact has never taken any of the steps necessary to become a publicly-

11   traded REIT, such as filing securities offering registration documents with the

12   Commission.

13      **H.      ACQUIRING INVESTOR FUNDS**

14         101.   Once potential Victims received the fundraising package from REP,

15   they were then contacted by a Closer.  While the Closers varied in their

16   presentations to potential Victims, they all emphasized REP's purported connection

17   to Coldwell Banker, REP's purported track record of profitable real estate

18   acquisitions, and the possibility of making a significant return on their investment.

19   The Closer would answer any questions the potential Victim had regarding the

20   Investment Funds and usually urgently warned Victims that units were selling fast

21   and that only a few units remained in the particular Investment Fund the Victim

22   was considering.  Closers also discussed the 4% annual dividend Victims would

23   receive, as well as REP's alleged "exit strategy," in which it would roll-up all of the

24   Investment Funds into a publicly traded real estate investment trust, or REIT, that

25   would be listed on a national stock exchange.

26

27

28

102.   Plaintiff is informed and believes, and on that basis alleges, that the Closers were personally trained by Owens, Davenport and Ryan to act as Closers and respond to inquires of the potential Victims.

103.   If the Closer was unable to answer any question posed by a potential Victim, the Victim would be forwarded to Ryan or Owens depending on which office the call originated from.  Ryan and Owens were the "Ultimate Closers" and would often speak with Victims regarding specific questions of concerns the Victims had.

104.   Once a Victim agreed to purchase units in an Investment Fund, Closers monitored closely and counseled the Victims on accurately completing the necessary paperwork.  Plaintiff is informed and believes, and on that basis alleges, that Owens, Ryan, Payne Oakland, Pai, and other representatives of Pine Mountain, NRE, PMG, RE Placement and TKJ assisted Victims in completing the necessary paperwork to ensure there would be no delay in receiving the Victim's money.

## I.   FUND ACCOUNTING

105.   Owens was responsible for the accounting for all of the Investment Funds.  It is believed that Owens delegated this responsibility to Matson, the bookkeeper, and his company, R.W. Matson, whom Owens hired.  Matson worked in the Santa Ana office.  However, Owens never explained to Matson how to allocate any of the Victim's funds or how to ensure Victim's funds were spent in a manner consistent with what was disclosed to Victims in the PPMs.  Davenport was aware that Matson was not ensuring that Victim's funds were spent in a manner consistent with the representations in the PPM's, because Matson admittedly told Davenport on several occasions that he, Matson, was "in over his head."

106.   Davenport, Owens, Ryan, Matson and other representatives of REP, Pine Mountain, NRE and PMG were responsible for investor relations.  These individuals received Victim's money once an investment was made, added the Victim to the investor record, routinely handled Victim inquires or complaints,

1    oversaw and processed the commission payments to the Fronters, Closers, Owens,

2    Ryan, Matson, Payne, Oakland, Pai, Pine Mountain, NRE, PMG, R.W. Matson, RE

3    Placement, TKJ, and other third-party vendors.

4         107.   Plaintiff is informed and believes, and on that basis alleges that the

5    money raised from the Victims was not segregated based on the Investment Fund

6    that each Victim invested in, but rather commingled all Victims' funds together.

7         108.   This practice of not segregating Victims' funds resulted in Victims'

8    money being used in connection with the acquisition of properties different than

9    what was represented to the Victim during the solicitation process.

10   **J.    USE OF INVESTOR FUNDS TO ACQUIRE PROPERTY**

11        109.   Following receipt by Owens, Matson, Payne, Ryan, Oakland, Pai, or

12   other representatives of Pine Mountain, NRE, PMG, RE Placement or TKJ of the

13   Victim's funds, the second phase of the Defendants' complex scheme was

14   implemented.

15        110.   The purpose of the second part of the scheme was the misappropriation

16   of Victim's funds by REP's insiders and executives. This was accomplished

17   through the acquisition and/or sale of real estate for the benefit of REP and its

18   insiders to the detriment of the Victims. The basics of the fraud were simple –

19   properties would be acquired with Victim's money but instead of taking title in the

20   name of the Investment Funds, title was taken in the name of REP or REP insiders.

21   Furthermore, as detailed herein, and undisclosed to the Victims, institutional equity

22   partners were brought in to assist in the real estate acquisitions, and due to this

23   involvement held the overwhelming majority of the equity interest in the property,

24   leaving REP and/or the Investment Funds only a small ownership interest, often

25   10% or less.

26        111.   For the properties that are currently owned by REP and the insiders,

27   the effect of this was to convert Victim's money into ownership interests in

28   properties for REP and its insiders. For the properties that have already been sold

1   by REP and the insiders, the effect was to convert Victim's money into cash

2   received upon the sale of the acquired property

3        112.   REP acquired at least 20 properties, including:

4             a.      The Oaks at Marymont, located in San Antonio, Texas (the

5   "Oaks Property");

6             b.      Montage – North Point, located in San Antonio, Texas (the

7   "Montage Property");

8             c.      Portofino, located in San Antonio, Texas (the "Portofino

9   Property");

10             d.      Seacrest Apartments, located in San Clemente, California (the

11   "Seacrest Property");

12             e.      Cedarwood Apartments, located in Gretna, Louisiana (the

13   Cedarwood Property");

14             f.      Baywood Apartments, located in Gretna, Louisiana (the

15   "Baywood Property");

16             g.      Aventurra at Dodson Ranch, located in Mesa Arizona (the

17   "Aventurra Property");

18             h.      Arbors at Warner Center, located in Woodland Hills, California

19   (the "Arbors Property");

20             i.      The Bridford Lake property, located in North Carolina (the

21   Bridford Property");

22             j.      The Cardinal property, located in North Carolina (the "Cardinal

23   Property");

24             k.      The Champion Club property, located in Virginia (the

25   "Champion Club Property");

26             l.      The Chatham Wood property, located in North Carolina (the

27   "Chatham Property");

28             m.      The Hickory Creek property, located Virginia, (the Hickory

1  Property");

2         n.      The Park West End property, located in Virginia, the (the "Park

3  Property");

4         o.      Madison at Adams, located in North Carolina, the (Madison

5  Property");

6         p.      The Las Brisas property, located in Arizona, (the "Las Brisas

7  Property");

8         q.      The Parliament property, located in San Antonio, Texas (the

9  Parliament Property");

10        r.      The Sunset Ridge property, located in Henderson, Nevada (the

11  "Sunset Property");

12        s.      The Segerstrom Property, located in Santa Ana, California (the

13  "Segerstrom Property"); and

14        t.      The Franklin property, located on Tustin, California (the

15  "Franklin Property").

16        113.   Plaintiff is informed and believes, and on that basis alleges, that the

17  Oaks Property; the Montage Property; the Portofino Property; the Seacrest

18  Property; Cedarwood Property; Baywood Property; Aventurra Property and Arbors

19  Property are still owned by REP.  Plaintiff is informed and believes, and on that

20  basis alleges that the remaining properties identified in Paragraph 112, have been

21  sold by REP and/or its insiders that held title to it.  In addition to using Victim's

22  money to acquire property, additional Victim's money was misappropriated by

23  REP and its insiders through the use of escrow accounts that were opened to

24  acquire or sell investment properties.

25        114.   Specifically, on numerous occasions when REP either bought or sold

26  investment properties with Victim's money, REP, and its insiders, including

27  Davenport and Thompson, directed that payments be made to REP, or its insiders,

28  directly out of the escrow accounts.  Plaintiff is informed and believes, and on that

1    basis alleges, that these payments were made regardless of whether REP was the

2    acquirer or seller of a particular property, and in many instances, REP and its

3    insiders would receive such distributions on both the acquisition and sale sides of a

4    transaction.  In other instances, REP misappropriated the Victim's money by

5    receiving a refund out of escrow, and then distributed the funds to REP insiders.

6    These distributions, which were reflected in escrow statements as "consulting fees"

7    or "acquisition fees", amounted to millions of dollars.

8         115.   Plaintiff is informed and believes, and on that basis alleges, that the

9    entities and individuals who received distributions either directly from escrow

10   accounts or from REP's attorney's client trust account, did not deserve such

11   payments and were not entitled to them. Plaintiff is further informed and believes,

12   and on that basis alleges, that the purpose of these distributions was to hide and

13   conceal these payments from the Victims, government regulators and other third

14   parties.  Plaintiff is informed and believes, and on that basis alleges, that these

15   payments resulted in REP and its insiders receiving significantly more money in the

16   form of fees, commissions, and other charges than was allowable pursuant to the

17   PPM for each Investment Fund.

18        116.   As for the real property interests currently held by REP or its insiders,

19   Plaintiff will be pursuing the recovery of such interests by way of an adversary

20   proceeding(s) in the Bankruptcy Court where the REP bankruptcy case is currently

21   pending. By way of this action, Plaintiff seeks only the recover the fruits of the

22   Defendants' misappropriation, i.e. the money received either by way of the sale of

23   one of the REP investment properties, the payment of monies to the Defendants out

24   of an escrow account, or the payment of money to  the Defendants out of REP

25   attorney's client trust account.

26        117.   As a direct result of Davenport's participation in the fraudulent scheme

27   perpetrated by the Defendants, Davenport received no less than $4,051,723.22,

28   representing commission payments, liquidated property interests, miscellaneous

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 2485135v2                              31
                                   COMPLAINT

1   acquisition, consulting or management fees, and/or disbursements from the client

2   trust account of one of REP's attorneys.   This represents the funds that Davenport

3   misappropriated from the Victims as more fully alleged herein.  Plaintiff is

4   informed and believes, and on that basis alleges, that without the active

5   participation of Davenport, Defendants would have been unable to continue to

6   perpetrate the scheme described herein.  Davenport was not entitled to, nor did he

7   lawfully earn, the funds paid to him as alleged herein, and as such it is inequitable

8   for Davenport to retain said funds.

9        118.   As a direct result of Thompson's participation in the fraudulent

10   scheme perpetrated by the Defendants, Thompson received no less than $50,348.74,

11   representing commission payments, liquidated property interests, miscellaneous

12   acquisition, consulting or management fees, and/or disbursements from the client

13   trust account of one of REP's attorneys.  This represents the funds that Thompson

14   misappropriated from the Victims as more fully alleged herein.  Plaintiff is

15   informed and believes, and on that basis alleges, that without the active

16   participation of Thompson, Defendants would have been unable to continue to

17   perpetrate the scheme described herein.  Thompson was not entitled to, nor did he

18   lawfully earn, the funds paid to him as alleged herein, and as such it is inequitable

19   for Thompson to retain said funds.

20        119.   As a direct result of Owens' participation in the fraudulent scheme

21   perpetrated by the Defendants, Owens received no less than $5,724.44, representing

22   commission payments, liquidated property interests, miscellaneous acquisition,

23   consulting or management fees, and/or disbursements from the client trust account

24   of one of REP's attorneys.   This represents the funds that Owens misappropriated

25   from the Victims as more fully alleged herein.  Plaintiff is informed and believes,

26   and on that basis alleges, that without the active participation of Owens, Defendants

27   would have been unable to continue to perpetrate the scheme described herein.

28   Owens was not entitled to, nor did he lawfully earn, the funds paid to him as

1   alleged herein, and as such it is inequitable for Owens to retain said funds.

2       120.  As a direct result of Ryan's participation in the fraudulent scheme

3   perpetrated by the Defendants, Ryan received no less than $3,700, representing

4   commission payments, liquidated property interests, miscellaneous acquisition,

5   consulting or management fees, and/or disbursements from the client trust account

6   of one of REP's attorneys.  This represents the funds that Ryan misappropriated

7   from the Victims as more fully alleged herein.  Plaintiff is informed and believes,

8   and on that basis alleges, that without the active participation of Ryan, Defendants

9   would have been unable to continue to perpetrate the scheme described herein.

10   Ryan was not entitled to, nor did he lawfully earn, the funds paid to him as alleged

11   herein, and as such it is inequitable for Ryan to retain said funds.

12       121.  As a direct result of Itzel's participation in the fraudulent scheme

13   perpetrated by the Defendants, Itzel received no less than $902,734.78, representing

14   commission payments, liquidated property interests, miscellaneous acquisition,

15   consulting or management fees, and/or disbursements from the client trust account

16   of one of REP's attorneys.  This represents the funds that Itzel misappropriated

17   from the Victims as more fully alleged herein.  Plaintiff is informed and believes,

18   and on that basis alleges, that without the active participation of Itzel, Defendants

19   would have been unable to continue to perpetrate the scheme described herein.

20   Itzel was not entitled to, nor did he lawfully earn, the funds paid to him as alleged

21   herein, and as such it is inequitable for Itzel to retain said funds.

22       122.  As a direct result of Oakland's participation in the fraudulent scheme

23   perpetrated by the Defendants, Plaintiff is informed and believe, and on that basis

24   allege that Oakland received substantial funds representing commission payments,

25   liquidated property interests, miscellaneous acquisition, consulting or management

26   fees, and/or disbursements from the client trust account of one of REP's attorneys.

27   This represents the funds that Oakland misappropriated from the Victims as more

28   fully alleged herein.  Plaintiff is informed and believes, and on that basis alleges,

1   that without the active participation of Oakland, Defendants would have been

2   unable to continue to perpetrate the scheme described herein.  Oakland was not

3   entitled to, nor did he lawfully earn, the funds paid to him as alleged herein, and as

4   such it is inequitable for Oakland to retain said funds.

5       123.   As a direct result of Pai's participation in the fraudulent scheme

6   perpetrated by the Defendants, Pai received no less than $6,087.00, representing

7   commission payments, liquidated property interests, miscellaneous acquisition,

8   consulting or management fees, and/or disbursements from the client trust account

9   of one of REP's attorneys.  This represents the funds that Pai misappropriated from

10  the Victims as more fully alleged herein.  Plaintiff is informed and believes, and on

11  that basis alleges, that without the active participation of Pai, Defendants would

12  have been unable to continue to perpetrate the scheme described herein.  Pai was

13  not entitled to, nor did he lawfully earn, the funds paid to him as alleged herein, and

14  as such it is inequitable for Pai to retain said funds.

15      124.   As a direct result of Payne's participation in the fraudulent scheme

16  perpetrated by the Defendants, Payne received no less than $15,650.00,

17  representing commission payments, liquidated property interests, miscellaneous

18  acquisition, consulting or management fees, and/or disbursements from the client

19  trust account of one of REP's attorneys.  This represents the funds that Payne

20  misappropriated from the Victims as more fully alleged herein.  Plaintiff is

21  informed and believes, and on that basis alleges, that without the active

22  participation of Payne, Defendants would have been unable to continue to

23  perpetrate the scheme described herein.  Payne was not entitled to, nor did he

24  lawfully earn, the funds paid to him as alleged herein, and as such it is inequitable

25  for Payne to retain said funds.

26      125.   As a direct result of Warren's participation in the fraudulent scheme

27  perpetrated by the Defendants, Warren received no less than $182,895.21,

28  representing commission payments, liquidated property interests, miscellaneous

1   acquisition, consulting or management fees, and/or disbursements from the client

2   trust account of one of REP's attorneys.  This represents the funds that Warren

3   misappropriated from the Victims as more fully alleged herein.  Plaintiff is

4   informed and believes, and on that basis alleges, that without the active

5   participation of Warren, Defendants would have been unable to continue to

6   perpetrate the scheme described herein. Warren was not entitled to, nor did he

7   lawfully earn, the funds paid to him as alleged herein, and as such it is inequitable

8   for Warren to retain said funds.

9        126.   As a direct result of Russell's participation in the fraudulent scheme

10   perpetrated by the Defendants, Russell received no less than $1,703,089.30,

11   representing commission payments, liquidated property interests, miscellaneous

12   acquisition, consulting or management fees, and/or disbursements from the client

13   trust account of one of REP's attorneys.  This represents the funds that Russell

14   misappropriated from the Victims as more fully alleged herein.  Plaintiff is

15   informed and believes, and on that basis alleges, that without the active

16   participation of Russell, Defendants would have been unable to continue to

17   perpetrate the scheme described herein.  Russell was not entitled to, nor did he

18   lawfully earn, the funds paid to him as alleged herein, and as such it is inequitable

19   for Russell to retain said funds.

20        127.   As a direct result of Smith's participation in the fraudulent scheme

21   perpetrated by the Defendants, Smith received no less than $122,438.29,

22   representing commission payments, liquidated property interests, miscellaneous

23   acquisition, consulting or management fees, and/or disbursements from the client

24   trust account of one of REP's attorneys.  This represents the funds that Smith

25   misappropriated from the Victims as more fully alleged herein.  Plaintiff is

26   informed and believes, and on that basis alleges, that without the active

27   participation of Smith, Defendants would have been unable to continue to

28   perpetrate the scheme described herein.  Smith was not entitled to, nor did he

1    lawfully earn, the funds paid to him as alleged herein, and as such it is inequitable

2    for Smith to retain said funds.

3        128.   As a direct result of Jones' participation in the fraudulent scheme

4    perpetrated by the Defendants, Jones received no less than $30,000, representing

5    commission payments, liquidated property interests, miscellaneous acquisition,

6    consulting or management fees, and/or disbursements from the client trust account

7    of one of REP's attorneys.  This represents the funds that Jones misappropriated

8    from the Victims as more fully alleged herein.  Plaintiff is informed and believes,

9    and on that basis alleges, that without the active participation of Jones, Defendants

10   would have been unable to continue to perpetrate the scheme described herein.

11   Jones was not entitled to, nor did he lawfully earn, the funds paid to him as alleged

12   herein, and as such it is inequitable for Jones to retain said funds.

13       129.   As a direct result of Matson's participation in the fraudulent scheme

14   perpetrated by the Defendants, Matson received no less than $166,819.58,

15   representing commission payments, liquidated property interests, miscellaneous

16   acquisition, consulting or management fees, and/or disbursements from the client

17   trust account of one of REP's attorneys.  This represents the funds that Matson

18   misappropriated from the Victims as more fully alleged herein.  Plaintiff is

19   informed and believes, and on that basis alleges, that without the active

20   participation of Matson, Defendants would have been unable to continue to

21   perpetrate the scheme described herein.  Matson was not entitled to, nor did he

22   lawfully earn, the funds paid to him as alleged herein, and as such it is inequitable

23   for Matson to retain said funds.

24       130.   As a direct result of Thompson Real Estate's participation in the

25   fraudulent scheme perpetrated by the Defendants, Thompson Real Estate received

26   no less than $2,510,418.17, representing commission payments, liquidated property

27   interests, miscellaneous acquisition, consulting or management fees, and/or

28   disbursements from the client trust account of one of REP's attorneys.  This

1   represents the funds Thompson Real Estate misappropriated from the Victims as

2   more fully alleged herein.  Plaintiff is informed and believes, and on that basis

3   alleges, that without the active participation of Thompson Real Estate, Defendants

4   would have been unable to continue to perpetrate the scheme described herein.

5   Thompson Real Estate was not entitled to, nor did he lawfully earn, the funds paid

6   to him as alleged herein, and as such it is inequitable for Thompson Real Estate to

7   retain said funds.

8        131.   As a direct result of Pine Mountain's participation in the fraudulent

9   scheme perpetrated by the Defendants, Pine Mountain received no less than

10   $3,638,245.12, representing commission payments, liquidated property interests,

11   miscellaneous acquisition, consulting or management fees, and/or disbursements

12   from the client trust account of one of REP's attorneys.  This represents the funds

13   that Pine Mountain  misappropriated from the Victims as more fully alleged herein.

14   Plaintiff is informed and believes, and on that basis alleges, that without the active

15   participation of Pine Mountain, Defendants would have been unable to continue to

16   perpetrate the scheme described herein.  Pine Mountain was not entitled to, nor did

17   he lawfully earn, the funds paid to him as alleged herein, and as such it is

18   inequitable for Pine Mountain to retain said funds.

19        132.   As a direct result of NRE's participation in the fraudulent scheme

20   perpetrated by the Defendants, NRE received no less than $6,370,206.00,

21   representing commission payments, liquidated property interests, miscellaneous

22   acquisition, consulting or management fees, and/or disbursements from the client

23   trust account of one of REP's attorneys.  This represents the funds that NRE

24   misappropriated from the Victims as more fully alleged herein.  Plaintiff is

25   informed and believes, and on that basis alleges, that without the active

26   participation of NRE, Defendants would have been unable to continue to perpetrate

27   the scheme described herein.  NRE was not entitled to, nor did he lawfully earn, the

28   funds paid to him as alleged herein, and as such it is inequitable for NRE to retain

1    said funds.

2        133.   As a direct result of PMG's participation in the fraudulent scheme

3    perpetrated by the Defendants, PMG received no less than $3,150,998.32,

4    representing commission payments, liquidated property interests, miscellaneous

5    acquisition, consulting or management fees, and/or disbursements from the client

6    trust account of one of REP's attorneys.  This represents the funds that PMG

7    misappropriated from the Victims as more fully alleged herein.  Plaintiff is

8    informed and believes, and on that basis alleges, that without the active

9    participation of PMG, Defendants would have been unable to continue to perpetrate

10   the scheme described herein.  PMG was not entitled to, nor did he lawfully earn, the

11   funds paid to him as alleged herein, and as such it is inequitable for PMG to retain

12   said funds.

13       134.   As a direct result of R.W. Matson's participation in the fraudulent

14   scheme perpetrated by the Defendants, R.W. Matson received no less than

15   $113,003.96, representing commission payments, liquidated property interests,

16   miscellaneous acquisition, consulting or management fees, and/or disbursements

17   from the client trust account of one of REP's attorneys.  This represents the funds

18   that R.W. Matson misappropriated from the Victims as more fully alleged herein.

19   Plaintiff is informed and believes, and on that basis alleges, that without the active

20   participation of R.W. Matson, Defendants would have been unable to continue to

21   perpetrate the scheme described herein.  R.W. Matson was not entitled to, nor did

22   he lawfully earn, the funds paid to him as alleged herein, and as such it is

23   inequitable for R.W. Matson to retain said funds.

24       135.   As a direct result of RE Placement's participation in the fraudulent

25   scheme perpetrated by the Defendants, RE Placement received no less than

26   $567,972.12, representing commission payments, liquidated property interests,

27   miscellaneous acquisition, consulting or management fees, and/or disbursements

28   from the client trust account of one of REP's attorneys.  This represents the funds

1   that RE Placement misappropriated from the Victims as more fully alleged herein.

2   Plaintiff is informed and believes, and on that basis alleges, that without the active

3   participation of RE Placement, Defendants would have been unable to continue to

4   perpetrate the scheme described herein. RE Placement was not entitled to, nor did

5   he lawfully earn, the funds paid to him as alleged herein, and as such it is

6   inequitable for RE Placement to retain said funds.

7       136.   As a direct result of TKJ's participation in the fraudulent scheme

8   perpetrated by the Defendants, TKJ received no less than $2,192,850.00,

9   representing commission payments, liquidated property interests, miscellaneous

10  acquisition, consulting or management fees, and/or disbursements from the client

11  trust account of one of REP's attorneys.   This represents the funds that TKJ

12  misappropriated from the Victims as more fully alleged herein. Plaintiff is

13  informed and believes, and on that basis alleges, that without the active

14  participation of TKJ, Defendants would have been unable to continue to perpetrate

15  the scheme described herein. TKJ was not entitled to, nor did he lawfully earn, the

16  funds paid to him as alleged herein, and as such it is inequitable for TKJ to retain

17  said funds.

18      137.   In total, the twenty-one Defendants misappropriated at least

19  $26,281,554.75 of the approximately 55 million raised from the Victims. This does

20  not account for the substantial returns on the sale of investment properties that were

21  also misappropriated by the Defendants, which Plaintiff is also seeking herein.

22  Plaintiff currently estimates that the misappropriation of the appreciation and return

23  on the real estate investments could increase significantly increase Plaintiff's

24  damage claims.

25  ///

26  ///

27  ///

28

## FIRST CLAIM FOR RELIEF

### FRAUD IN CONNECTION WITH THE PURCHASE

### OR SALE OF SECURITIES

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

**(Against Defendants Davenport, Thompson, Owens, Payne, Ryan,**

**Matson, Oakland, Pai, Pine Mountain, NRE, PMG, RE**

**Placement, R.W. Matson, TKJ and DOES 1-100)**

138.   Plaintiff realleges and incorporates by reference paragraphs 1 through 137 above.

139.   Each Victim included within the Plaintiff committee purchased one or more units in at least one of the Investment Funds from Defendants Davenport, Owens, Payne, Ryan, Matson, Oakland, Pai, Pine Mountain, NRE, PMG, RE Placement, R.W. Matson, Inc. and/or TKJ (collectively, "Selling Defendants")

140.   The Investment Funds offered and sold by the Selling Defendants to the Victims are investment securities because they involve: (1) the investment of money; (2) in a common enterprise; (3) with the expectation of profits garnered solely from the efforts of others.  More specifically:

a.      The value of the Investment Fund is dependent upon the success or failure of the renovation, management, and operation of the numerous real estate holdings of REP, its related entities, and the Investment Funds;

b.      The Selling Defendants' sale of units in the Investment Funds gave rise to a reasonable expectation that a valuable benefit, over and above the acquisition of the real estate, would accrue to the Victims as a result of the real estate expertise of REP, its principals, officers, agents, related entities and the Investment Funds.

c.      The Victims, as owners of at least one unit in one of the seven Investment Funds, did not receive, and did not intend to receive, the right to exercise any practical or actual control over the managerial decisions of REP.  Once

1  the Victims bought units in one of the Investment Funds, REP, its principals,

2  officers, agents and related entities exercised all control regarding the acquisition

3  and management of the real estate acquired.

4      141.   The Selling Defendants were "sellers," "promoters," and/or "sales

5  persons" as those terms are defined by the Securities Act of 1933 and the Securities

6  Exchange Act of 1934.

7      142.   The Selling Defendants, by engaging in the conduct described above,

8  directly or indirectly, in connection with the purchase or sale of a security, by the

9  use of means or instrumentalities of interstate commerce, of the mails, or of the

10  facilities of a national securities exchange, with scienter:

11          a.      employed devices, schemes, or artifices to defraud;

12          b.      made untrue statements of a material fact or omitted to state a

13  material fact necessary to make the statements made, in the light of the

14  circumstances under which they were made, not misleading; and

15          c.      engaged in acts, practices, or courses of business which operated

16  or would operate as a fraud or deceit upon other persons.

17      143.   The following material misrepresentations were made to potential

18  Victims of the Investments Funds:

19          a.      The overstatement of a relationship between REP, the

20  Investment Fund and Coldwell Banker Commercial;

21          b.      The misrepresentation as to the source of promised "dividends"

22  to be paid to the Victims during the first two years of the Victims' investment;

23          c.      Misrepresentations as to the potential investment returns that

24  Victims could expect; and

25          d.      Misrepresentations as to how investor funds would be used,

26  including the misrepresentation of the percentages of each invested dollar that could

27  be paid for commissions and related fees, and the percentage that would be used for

28  the acquisition of the investment properties.

1    144.   As to the Victims who purchased units in Income Fund I, these

2    representations occurred between January 1, 2003 and August 15, 2003.

3    145.   As to the Victims who purchased units in Unit Business Investment

4    Fund I, these representations occurred between June 18, 2003 and

5    December 31, 2003.

6    146.   As to the Victims who purchased units in Income Fund II, these

7    representations occurred between August 12, 2003 and March 31, 2004.

8    147.   As to the Victims who purchased units in Income Fund III, these

9    representations occurred between April 24, 2004 and December 31, 2004.

10   148.   As to the Victims who purchased units in Unit Business Investment

11   Fund II, these representations occurred between April 29, 2004 and

12   December 31, 2004.

13   149.   As to the Victims who purchased units in Equity Fund, these

14   representations occurred between January 1, 2005 and at the very latest,

15   September of 2007, the date the Securities and Exchange Commission filed its

16   civil action against REP and its related entities.

17   150.   As to the Victims who purchased units in Growth Fund, these

18   representations occurred between January 1, 2005 and at the very latest,

19   September of 2007, the date the Securities and Exchange Commission filed its

20   civil action against REP and its related entities.

21   151.   Plaintiff is informed and believes, and on that basis alleges, that

22   Davenport with Owens and others made the foregoing representations directly to

23   potential Victims and instructed Owens, Ryan, Matson, Payne, Oakland, Pai,

24   Pine Mountain, NRE, PMG, RE Placement, TKJ, and other representatives of

25   Pine Mountain, NRE, PMG, RE Placement, R.W. Matson and TKJ, to make these

26   misrepresentations to potential Victims.

27   152.   Plaintiff is informed and believes, and on that basis alleges, that

28   Davenport also drafted, designed and approved the written solicitation materials

1   and PPMs that contained the foregoing misrepresentations, and did so with the

2   intent that said solicitations and PPMs would be sent to potential Victims with the

3   intent that they rely on said misrepresentations.

4        153.   Plaintiff is informed and believes, and on that basis alleges, that

5   Thompson assisted in the drafting, design and approval of the written solicitation

6   materials that contained the foregoing misrepresentations, and did so with the

7   knowledge that these written materials would be sent to potential Victims with the

8   intent that they rely on said misrepresentations.

9        154.   Owens, Pine Mountain and NRE made the foregoing

10  misrepresentations directly to potential Victims and instructed Ryan, Payne,

11  Matson, Oakland, Pai, PMG, RE Placement, R.W. Matson, TKJ, and other

12  representatives of Pine Mountain, NRE, PMG, RE Placement, R.W. Matson and

13  TKJ, to make these misrepresentations to potential Victims.  Plaintiff is informed

14  and believes, and on that basis alleges, that Owens, Pine Mountain, and NRE

15  participated in the drafting, design and approval of the written solicitation materials

16  and PPMs that contained the foregoing misrepresentations, and did so with the

17  intent that said solicitations and PPMs would be sent to potential Victims with the

18  intent that they rely on said misrepresentations.

19       156.   The misrepresentations and conduct of Pine Mountain and NRE were

20  made with the authorization, consent and knowledge of Owens, Pine Mountain and

21  NRE's top executive officer.

22       157.   Plaintiff is informed and believes, and on that basis alleges, that Ryan

23  and PMG made the foregoing misrepresentations directly to potential Victims and

24  instructed, Payne, Oakland, Pai, Pine Mountain, NRE, RE Placement, R.W.

25  Matson, TKJ, and other representatives of Pine Mountain, NRE, PMG, RE

26  Placement, R.W. Matson and TKJ, to make these misrepresentations to potential

27  Victims.

28  ///

158.   Plaintiff is informed and believes, and on that basis alleges that Ryan and PMG participated in the drafting, design and approval of the written solicitation materials and PPMs that contained the foregoing misrepresentations, and did so with the intent that said solicitations and PPMs would be sent to potential Victims with the intent that they rely on said misrepresentations.

159.   The misrepresentations and conduct of PMG were made with the authorization, consent and knowledge of Ryan, PMG's top executive officer.

160.   Plaintiff is informed and believe, and on that basis allege, that Payne made the foregoing misrepresentations directly to potential Victims and instructed Owens, Ryan, Oakland, Pai, Matson, Pine Mountain, NRE, PMG, RE Placement, R.W. Matson, TKJ, and other representatives of Pine Mountain, NRE, PMG, RE Placement, R.W. Matson and TKJ, to make these misrepresentations to potential Victims.

161.   Plaintiff is informed and believes, and on that basis alleges that Payne participated in the distribution of written solicitation materials and PPMs that contained the foregoing misrepresentations to the Victims, and did so with the intent that the Victims rely on said misrepresentations.

162.   Plaintiff is informed and believes, and on that basis alleges, that Oakland, Pai, Matson, RE Placement, TKJ and R.W. Matson made the foregoing misrepresentations directly to potential Victims and instructed employees and representatives of Pine Mountain, NRE, PMG, RE Placement, TKJ and R.W. Matson to make these misrepresentations to potential Victims.

163.   Plaintiff is informed and believes, and on that basis alleges, that Oakland, Pai, RE Placement and TKJ participated in the distribution of written solicitation materials and PPMs that contained the foregoing misrepresentations to the Victims, and did so with the intent that the Victims rely on said misrepresentations.

///

1    164.   The misrepresentations and conduct of RE Placement were made with

2    the authorization, consent and knowledge of Oakland, RE Placement's top

3    executive officer.

4    165.   The misrepresentations and conduct of TKJ were made with the

5    authorization, consent and knowledge of Pai, TKJ's top executive officer.

6    166.   The misrepresentations and conduct of R.W. Matson were made with

7    the authorization, consent and knowledge of Matson, R.W. Matson's top executive

8    officer.

9    167.   The Selling Defendants acted with the intent to deceive, manipulate,

10   and defraud Victims.

11   168.   As a direct and proximate result of the misrepresentations and fraud by

12   the Selling Defendants, the plaintiff has been damaged in an amount in excess of

13   $55,000,000.00, actual amount to be proven at trial.

14   169.   The Selling Defendants' securities fraud justifies rescission, injunctive

15   relief, restitution, interest, and damages against the Selling Defendants in an

16   amount to be proven at trial, and any other relief the court may deem appropriate.

17   **SECOND CLAIM FOR RELIEF**

18   **Violation of Sections 12(a)(1) and 12(a)(2) of the Securities Act of 1933**

19   **(Against Defendants Davenport, Thompson, Owens, Payne, Ryan,**

20   **Matson, Oakland, Pai, Pine Mountain, NRE, PMG, RE**

21   **Placement, R.W. Matson, TKJ and DOES 1-100)**

22   170.   Plaintiff realleges and incorporates by reference paragraphs 1 through

23   137 above.

24   171.   The Victims each purchased units in one or more of the Investment

25   Funds from the Selling Defendants, which were offered to the public via written

26   communications and telephone.

27   172.   The Investment Funds were offered and sold by the Selling Defendants

28   to the Victims are investment securities because they involve: (1) the investment of

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 2485135v2

45

1   money; (2) in a common enterprise; (3) with the expectation of profits garnered

2   solely from the efforts of others.  More specifically:

3          a.      The value of the Investment Funds is dependent upon the

4   success or failure of the Selling Defendants' renovation, management, and

5   operation of the numerous real estate holdings of REP;

6          b.      The Selling Defendants' sale of the Investment Funds gave rise

7   to a reasonable expectation that a valuable benefit, over and above the acquisition

8   of the real estate, would accrue to the Victims as a result of the real estate expertise

9   of REP and its principals, officers, and agents;

10         c.      The Victims, as owners of at least one unit in the above

11  mentioned funds, did not receive, and did not intend to receive, the right to exercise

12  any practical or actual control over the managerial decisions of REP.  Once the

13  Victims bought units in the Funds, REP and its principals, officers, and agents

14  exercised all control regarding decisions to acquire and manage real estate.

15         173.   The Selling Defendants were "sellers," "promoters," and/or "sales

16  persons" as those terms are defined by the Securities Act of 1933 and the Securities

17  Exchange Act of 1934.

18         174.   The Selling Defendants, by engaging in the conduct described above,

19  directly or indirectly, in connection with the offer or sale of a security, violated 15

20  U.S.C. § 77e by failing to register the Funds as securities.

21         175.   The Selling Defendants, by the use of any means or instruments of

22  transportation or communication in interstate commerce or of the mails, by means

23  of a prospectus or oral communication, made untrue statements of material facts or

24  omitted to state a material fact necessary in order to make the statements, in the

25  light of the circumstances under which they were made, not misleading.

26         176.   The Victims, in the exercise of reasonable care, could not have known

27  of such untruth or omission made by the Defendants.

28  ///

177.   As a direct and proximate result of the misrepresentations, fraud, and prospectus by the Selling Defendants, the plaintiff has been damaged in an amount in excess of $55,000,000.00, actual amount to be proven at trial.

178.   The Selling Defendants' securities fraud justifies rescission, injunctive relief, restitution, interest, and damages against the Selling Defendants in an amount to be proven at trial, and any other relief the court may deem appropriate.

### THIRD CLAIM FOR RELIEF

### VIOLATION OF CALIFORNIA SECURITIES LAWS

### CALIFORNIA SECURITIES LAW OF 1968 §§ 25000, *et seq.*

### (Against Defendants Davenport, Thompson, Payne, Owens, Ryan, Matson, Oakland, Pai, Pine Mountain, NRE, PMG, RE Placement, R.W. Matson, TKJ and DOES 1-100)

179.   Plaintiff realleges and incorporates by reference paragraphs 1 through 137 above as though fully set forth herein.

180.   The Victims each purchased units in one or more of the Investment Funds, as detailed above.

181.   The Selling Defendants' offer to sell securities by written and oral communication included untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

182.   The Selling Defendants' sale of unqualified securities in violation of § 25000, *et seq.* of the California Securities Law of 1968 justifies rescission, injunctive relief, restitution, interest, attorney's fees and damage against the Selling Defendants.

///
///
///
///

# FOURTH CLAIM FOR RELIEF

## FRAUD

### (Against Defendants Davenport, Thompson, Payne, Owens, Ryan, Matson, Oakland, Pai, Pine Mountain, NRE, PMG, RE Placement, R.W. Matson, TKJ and DOES 1-100)

183.   Plaintiff realleges and incorporates by reference paragraphs 1 through 137 above as though fully set forth herein.

184.   Defendants Davenport, Payne, Owens, Ryan, Matson, Oakland, Pai, Pine Mountain, NRE, PMG, RE Placement and TKJ had a duty to honestly and accurately represent all material information, including the potential income from the Investment Funds, the affiliation between the Investment Funds and Coldwell Banker, the Investment Funds' exit strategy, and the source of dividend payments to the Victims.

185.   These defendants breached these duties, as detailed above in Paragraphs 42, 56 and 57 by intentionally making false and misleading oral statements and including false statements in the fundraising and marketing materials distributed to the Victims.  Plaintiff is informed and believes, and on that basis alleges, that these defendants knew, but did not disclose, the truth regarding the various misleading statements made to the Victims.

186.   The misrepresentations made to Victims were made via telephone, from either the Santa Ana or Irvine boiler-room to Victims and via the solicitation material sent by these defendants using the mail.

187.   Plaintiff is informed and believes, and on that basis alleges, that Davenport, Owens, Ryan, Matson, Payne, Oakland and Pai made the referenced misrepresentations directly to Victims, and/or instructed these same defendants and other representatives of Pine Mountain, NRE, PMG, RE Placement, R.W. Matson and TKJ to make these representations to Victims to induce the Victims to invest in one of the Investment Funds.

1    188.   Plaintiff is informed and believes, and on that basis alleges, that
2  Matson received the investor funds from Victims once an investment was made.
3  Plaintiff is further informed and believes, and on that basis alleges, that Matson
4  made representations, orally, in writing, and by his conduct in accepting and
5  processing the Victim's payments that this was a legitimate investment and that the
6  prior representations of the Selling Defendants were accurate.

7    189.   These defendants knew, and in fact intended, that the Victims would
8  rely, in part or entirely, on the misrepresentations when deciding whether to
9  purchase units in the Investment Funds or to keep their monies in the Investment
10 Funds.

11    190.   The above referenced representations were known to be false by these
12 defendants, but believed to be true by the Victims.  The Victims reasonably relied
13 upon the truth of these misrepresentations when they purchased units in one or
14 more of the Investment Funds.  At the time these misrepresentations were made, the
15 Victims had no way to know that the representations were false and untrue.  Had
16 the Victims known that the representations made by these defendants were untrue,
17 the Victims would not have purchased units in the in the Investment Funds.

18    191.   As a direct and proximate result of the intentional misrepresentations
19 made by these defendants and the Victims' justifiable reliance thereon, the plaintiff
20 has been damaged in an amount in excess of $55,000,000, the actual amount to be
21 proven at the time of trial.

22    192.   The aforementioned acts of these defendants were willful and
23 malicious.  Therefore, the plaintiff is entitled to punitive damages in an amount
24 sufficient to punish Defendants and to deter future conduct of this type.

25  ///
26  ///
27  ///
28  ///

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 2485135v2

49

COMPLAINT

# FIFTH CLAIM FOR RELIEF

## NEGLIGENT MISREPRESENTATION

**(Against Defendants Davenport, Thompson, Payne, Owens, Ryan,**

**Oakland, Pai, Pine Mountain, NRE, PMG, RE**

**Placement, R.W. Matson, TKJ and DOES 1-100)**

193.   Plaintiff realleges and incorporates by reference paragraphs 1 through 137 above as though fully set forth herein.

194.   The Defendants supplied false information to the Victims in connection with the purchase of units in one or more of the Funds.  The Victims justifiably relied upon such false information, and the Defendants failed to exercise reasonable care or competence in obtaining and communicating this false information to the Victims.

195.   The misrepresentations were made to Victims via telephone, from either the Santa Ana or Irvine boiler-room to Victims, and via the transmission of solicitation material to the Victims via the mail by the Selling Defendants.

196.   Plaintiff is informed and believes, and on that basis alleges, that Davenport, Owens, Ryan, Payne, Oakland, Pai, made the referenced misrepresentations directly to Victims, and/or instructed these same Defendants and other representatives of Pine Mountain, NRE, PMG, RE Placement, and TKJ to make these representations to Victims to induce the Victims to invest in one of the Investment Funds.

197.   When each of the above referenced misrepresentations were made to the Victims, the Selling Defendants had a duty to be truthful and to not misrepresent any facts relating to the investment or the Investment Funds.

198.   The Selling Defendants failed to exercise reasonable care or competence in disseminating information to the Victims via fundraising materials, marketing materials, and oral communications.

///

1    199.   The above referenced representations were believed to be true by the

2    Victims.  The Victims reasonably relied upon the truth of these misrepresentations

3    when they purchased units in one or more of the Investment Funds.  At the time the

4    Selling Defendants made these misrepresentations to the Victims, the Victims had

5    no way to know that the representations were false and untrue.

6    200.   Had the Victims known that the representations made by the Selling

7    Defendants were untrue, the Victims would not have invested in the Investment

8    Funds.

9    201.   When each of the above referenced misrepresentations were made to

10   the Victims, the Selling Defendants knew, or should have known at the time these

11   representations were made to the Victims, that the Victims would rely upon and be

12   mislead by these misrepresentations. Selling Defendants therefore breached their

13   respective duty owed to the Victims.

14   202.   The Selling Defendants' negligent misrepresentations have damaged

15   the Victims and continue to damage the Victims in an amount to be proven at trial.

16   203.   As a direct, foreseeable and proximate result of the Defendants'

17   negligent misrepresentations, the plaintiff has suffered and continues to suffer

18   substantial financial losses, in excess of $55,000,000.00, the actual amount to be

19   proven at trial.

20   ### SIXTH CLAIM FOR RELIEF

21   ### CONSPIRACY TO DEFRAUD

22   **(Against Defendants Davenport, Thompson, Payne, Owens, Ryan,**

23   **Matson, Oakland, Pai, Pine Mountain, NRE, PMG, RE**

24   **Placement, R. W. Matson, TKJ and DOES 1-100)**

25   204.   Plaintiff realleges and incorporates by reference paragraphs 1 through

26   202 above as though fully set forth herein.

27   205.   Defendants Davenport, Payne, Owens, Ryan, Matson, Oakland, Pai,

28   Pine Mountain, NRE, PMG, RE Placement, and TKJ, as the sellers of a security,

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 2485135v2                              51
COMPLAINT

1   owed the Victims, as the prospective purchaser of a security, a duty to be truthful

2   and to not misrepresent relevant and materials facts with regard to the prospective

3   purchase.  These defendants also owed the Victims a duty to not disseminate or

4   distribute false and misleading written materials relating to the prospective

5   investments.

6       206.   Defendants Davenport, Payne, Owens, Ryan, Matson, Oakland, Pai,

7   Pine Mountain, NRE, PMG, RE Placement, and TKJ, knowingly conspired and

8   agreed with each other to make misleading and false statements to potential

9   investors and to formulate and distribute the false and misleading PPM,

10  fundraising, marketing, and promotional materials, as detailed above, with the

11  specific intent to defraud the Victims by fraudulently obtaining their monies.

12      207.   These defendants acted on this agreement when they made false and

13  misleading statements to prospective Victims, when they authored, prepared and

14  disseminated the false and misleading solicitation materials to the Victims and

15  when they thereafter fraudulently obtained the Victims' monies.

16      208.   Plaintiff is informed and believes, and on that basis alleges, that each

17  of the Selling Defendants had a separate and distinct role in the scheme to defraud

18  the Victims, and that the scheme could not have been accomplished but for the

19  contribution of each of the Selling Defendants.

20      209.   The Defendants' conspiracy to defraud the Victims and the

21  corresponding acts have damaged the plaintiff in an amount in excess of

22  $55,000,000.00, the actual amount to be proven at trial.

23      210.   The aforementioned acts of these conspiring defendants were willful

24  and malicious in that the Defendants fraudulently obtained the Victims' monies

25  with the deliberate intent to injure the value of the investments for their own

26  personal gain.  The plaintiff is therefore entitled to punitive damages in an amount

27  sufficient to punish Defendants and to deter future conduct of this type.

28  ///

# SEVENTH CLAIM FOR RELIEF

## COMMISSION OF UNLAWFUL, UNFAIR, AND FRAUDULENT BUSINESS ACTS AND PRACTICES

### CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200

**(Against Defendants Davenport, Thompson, Payne, Owens, Ryan, Matson, Pai, Oakland, Pine Mountain, NRE, PMG, RE Placement, R.W. Matson, TKJ and DOES 1-100)**

211.   Plaintiff realleges and incorporates by reference paragraphs 1 through 209 above as though fully set forth herein.

212.   California Business & Professions Code § 17200, *et seq.* prohibits acts of unfair competition, which means and includes any "fraudulent business act or practice . . ." and conduct that is "likely to deceive" and is "fraudulent" within the meaning of §17200.

213.   By engaging in the conduct described above, each of the Defendants violated, and continue to violate, § 17200.

214.   The plaintiff is therefore entitled to injunctive relief and restitution as available under California Business & Professions Code § 17200, *et seq.*

# EIGHTH CLAIM FOR RELIEF

## UNTRUE OR MISLEADING ADVERTISING

### CALIFORNIA BUSINESS & PROFESSIONS CODE § 17500

**(Against Defendants Davenport, Thompson, Payne, Owens, Ryan, Matson, Pai, Oakland, Pine Mountain, NRE, PMG, RE Placement, R.W. Matson, TKJ and DOES 1-100)**

215.   Plaintiff realleges and incorporates by reference paragraphs 1 through 209 above as though fully set forth herein.

216.   Through REP's advertising practices, marketing and fundraising materials, the Defendants disseminated untrue and misleading statements and omitted material facts pertinent to the Victims' decision to purchase units in one or

1   more of the Funds in violation of California Business & Professions Code § 17500,

2   *et seq.*

3   217.   The advertising, marketing, and fundraising materials were likely to

4   deceive and did deceive the Victims.

5   218.   The Defendants misrepresented material facts to the Victims for the

6   purpose of inducing the Victims to purchase units in one or more of the Funds.

7   219.   The Defendants knew, or should have known, that their representations

8   were false, but believed to be true by the Victims.  The Victims reasonably relied

9   upon these representations to purchase units in the Funds.

10   220.   The Defendants knew, or should have known, that their representations

11   regarding the Funds were made, or caused to be made, to members of the general

12   public through the use of REP's website, fundraising material, marketing material,

13   and telephone centers.

14   221.   The plaintiff is therefore entitled to the relief available under

15   California Business & Professions Code § 17500, et seq.

16   **NINTH CLAIM FOR RELIEF**

17   **MISAPPROPRIATION**

18   **(Against All Defendants)**

19   222.   Plaintiff realleges and incorporates by reference paragraphs 1 through

20   137 above as though fully set forth herein.

21   223.   As set forth above, the Defendants have misappropriated the funds

22   invested by the Victims.   The misappropriation was accomplished through the

23   misappropriation of Victim's funds directly from bank accounts controlling such

24   funds, through the use of escrow accounts to siphon off Victim's funds as "fees",

25   and through the payment of commissions and other fees to Fronters, Closers, and

26   the Defendants herein in violation of the PPM.

27   ///

28   ///

BUCHALTER NEMER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 2485135v2

COMPLAINT

224. As a direct and proximate result of the Defendants' misappropriation of the investment funds, the Victims have suffered and continue to suffer actual damages in an amount no less than $55,000,000.

225. The aforementioned acts of the Defendants were willful and malicious in that the Defendants misappropriated the investment funds with the deliberate intent to injure the Victims' interests for their own personal gain. Plaintiff is therefore entitled to punitive damages in an amount sufficient to punish Defendants and to deter future conduct of this type.

## TENTH CLAIM FOR RELIEF

## CONVERSION

### (Against All Defendants)

226. Plaintiff realleges and incorporates by reference paragraphs 1 through 137 above as though fully set forth herein.

227. Through the Defendants' active participation in this fraudulent scheme, they were able to obtain payments, fees, commissions and ownership interests in real property from the various real estate transactions that should have been conducted for the benefit of the Victims. This conversion of funds and real property was accomplished without the knowing permission or consent of the Victims and was carried out deliberately and with the specific intent to deprive the Victims of their monies and property.

228. As a direct and proximate result of the conversion of the Victims' monies and property, the Victims have suffered damages in excess of $55,000,000.00, the actual amount to be proven at trial.

229. The acts and omissions of Defendants in converting the Victims' monies and property were done with a conscious disregard of the Victims' rights and with a specific intent to defraud and injure the Victims, so as to constitute fraud, oppression and malice. By virtue of the Defendants' willful conduct, the Victims are entitled to punitive and exemplary damages as determine by the court.

## ELEVENTH CLAIM FOR RELIEF

## UNJUST ENRICHMENT/DISGORGEMENT

### (Against All Defendants)

230.   Plaintiff realleges and incorporates by reference paragraphs 1 through 137 above as though fully set forth herein.

231.   As a direct and proximate result of the acts and conduct alleged herein, each of the Defendants have been unjustly enriched, and has obtained money, commissions, fees, earnings, and benefits to which the Defendants are not otherwise entitled, and which they would not have obtained had the true facts been known to the Victims.

232.   The source of funds that these Defendants were unjustly enriched by are the Victim's funds.

233.   It is patently unfair, unjust and inequitable for any of the Defendants to retain any of the money, commissions, fees, earnings, or benefits they received from the Victims' monies at the expense of the Victims.

234.   Plaintiff is entitled to, and hereby seeks disgorgement of all fees, commissions, real property, and other payments made to the Defendants by the plaintiffs, in amounts to be proven at trial.

## TWELFTH CLAIM FOR RELIEF

## CONSTRUCTIVE TRUST

### (Against All Defendants)

235.   Plaintiff realleges and incorporates by reference paragraphs 1 through 233 above as though fully set forth herein.

236.   The Defendants obtained in excess of $55,000,000.00 from the Victims to which they were not entitled to receive.  The Defendants obtained $55,000,000.00 from the Victims as a result of their deception and fraud as alleged herein.

///

237.   Equitable principles provide that one, who has paid money to another who is not entitled to have it as the Victims have suffered herein, should not suffer unconscionable loss or unjustly enrich the other, as the Defendants have been unjustly enriched herein at the Victims' unconscionable loss.  The Victims are entitled to immediate possession of the money received from the Victims, and/or by which the Defendants benefitted.

238.   As a direct and proximate result of the conduct of the Defendants alleged herein, the plaintiffs are entitled to the imposition of a constructive trust in an amount according to proof, but reasonably believed to exceed $55,000,000.00

## THIRTEENTH CLAIM FOR RELIEF

### APPOINTMENT OF RECEIVER

#### (Against all Defendants)

239.   Plaintiff realleges and incorporates by reference paragraphs 1 through 236 above as though fully set forth herein.

240.   Plaintiff is informed and believes, and on that basis alleges, that the Defendants are financially incapable of satisfying any monetary judgment that might ultimately be entered against them.

241.   Demand has been made upon the Defendants to pay the Plaintiff the full amount taken from the Victims, but the Defendants are unable and have refused and continue to refuse to comply with this demand.

242.   It is impracticable and impossible for the Victims to enjoy the rights and benefits granted to them under the Investment Funds without the appointment of a receiver who has the power and authority to take possession of the personal and real property and to manage and operate the real property, including collection of the rents, issues and profits therefrom or by selling the real property.

243.   The Plaintiff has no plain, speedy and adequate remedy at law, and will suffer irreparable damage, injury and harm unless equitable relief is granted.

///

244.   By reason of the foregoing, the Plaintiff requests that this Court appoint a receiver to take control of, manage, and care for the real property, or by selling the real property.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests:

### AS TO CLAIM I

1.   For damages in an amount according to proof at the time of trial;
2.   For punitive damages;
3.   For interest thereon;
4.   For costs of suit herein; and
5.   For such further relief as the Court may deem just and proper.

### AS TO CLAIM II

1.   For damages in an amount according to proof at the time of trial;
2.   For punitive damages;
3.   For interest thereon;
4.   For costs of suit herein;
5.   For rescission of the sale; and
6.   For such further relief as the Court may deem just and proper.

### AS TO CLAIM III

1.   For rescission, injunctive relief, restitution, prejudgment interest, attorneys' fees and damages pursuant to Sections 25000 *et seq.* of the California Securities Law of 1968; and
2.   For such further relief as the Court may deem just and proper.

### AS TO CLAIM IV

1.   For damages in an amount according to proof at the time of trial;
2.   For punitive damages;
3.   For interest thereon;
4.   For costs of suit herein; and

5.     For such further relief as the Court may deem just and proper.

## AS TO CLAIM V

1.     For monetary damages in an amount according to proof at the time of trial;

2.     For costs of suit herein; and

3.     For such further relief as the Court may deem just and proper.

## AS TO CLAIM VI

1.     For damages in an amount according to proof at the time of trial;

2.     For punitive damages;

3.     For interest thereon;

4.     For costs of suit herein; and

5.     For such further relief as the Court may deem just and proper.

## AS TO CLAIM VII

1.     For injunctive relief and restitution as available under California Business and Professions Code § 17200, *et seq.*;

2.     For costs of suit herein; and

3.     For such further relief as the Court may deem just and proper.

## AS TO CLAIM VIII

1.     For injunctive relief as entitled pursuant to California Business and Professions Code § 17500, *et seq.*;

2.     For costs of suit herein; and

3.     For such further relief as the Court may deem just and proper.

## AS TO CLAIM IX

1.     For monetary damages in an amount according to proof at the time of trial;

2.     For costs of suit herein;

3.     Punitive damages; and

4.     For such further relief as the Court may deem just and proper.

## AS TO CLAIM X

1. For monetary damages in an amount according to proof at the time of trial;

2. For costs of suit herein;

3. Punitive damages; and

4. For such further relief as the Court may deem just and proper.

## AS TO CLAIM XI

1. For monetary damages in an amount according to proof at the time of trial;

2. Disgorgement and Restitution of all monies and property wrongfully obtained from the Plaintiff, in an amount to be determined at trial;

3. Punitive damages; and

4. For such further relief as the Court may deem just and proper.

## AS TO CLAIM XII

1. For imposition of a constructive trust for all monies and property retained by the Defendants belonging to the Plaintiff, which is reasonably believed to exceed $55,000,000.00; and

2. For such further relief as the Court may deem just and proper.

## AS TO CLAIM XIII

1. For an order of the Court appointing a receiver to protect and preserve the monies;

2. That the powers of the Receiver shall be all the usual and customary powers of a receiver to take possession of monies and, if necessary, take control of, operate, manage, complete and/or sell any Real Property in whole or in part; and

3. For such further relief as the Court may deem just and proper.

///

///

## AS TO ALL CLAIMS

1.      For Plaintiff's costs of suit, including attorneys fees; and

2.      For such further relief as the Court may deem just and proper.

DATED:      December 23, 2008          BUCHALTER NEMER
                                       A Professional Corporation


                                       By: _____
                                            RICHARD P. ORMOND
                                            Attorneys for Plaintiff
                                            Joint Equity Committee of Investors

1

# DEMAND FOR JURY TRIAL

2        Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury of

3   all issues so triable.

4   DATED:        December 23, 2008        BUCHALTER NEMER
                                          A Professional Corporation
5

6

7                                         By: _____
                                               RICHARD P. ORMOND
8                                         Attorneys for Plaintiff
                                          Joint Equity Committee of Investors

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| JOINT EQUITY COMMITTEE OF INVESTORS OF REAL ESTATE PARTNERS, INC. AND ITS RELATED ENTITIES | DAWSON L. DAVENPORT, etc., et al. |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide name.) | Attorneys (If Known) |
|---|---|
| Jeffrey K. Garfinkle, Richard P. Ormond, Matthew L. Seror<br>BUCHALTER NEMER<br>1000 Wilshire Boulevard, Suite 1500<br>Los Angeles, CA 90017-2457<br>Tele: (213) 891-0700; Fax: (213) 896-0400 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff     ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant     ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☐ No     ☒ MONEY DEMANDED IN COMPLAINT: $ 55,000,000.00

**VI. CAUSE OF ACTION** (Cite the U. S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 USC § 77e et seq.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 22 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☒ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 61 HIA(1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities – Employment | ☐ 640 R.R.& Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **IMMIGRATION** | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW 405(g)) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities – Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus- Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:**   Case Number: **CV08-08551 SJO (RNBx)**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

American LegalNet, Inc.
www.FormsWorkflow.com

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?   ☒ No ☐ Yes

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?   ☐ No ☒ Yes

If yes, list case number(s):   SACV07-1022 AG (RNBx)

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)   ☒ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange | |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange | |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
   **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange | |

* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
**Note: In land condemnation cases, use the location of the tract of land involved.**

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date December 23, 2008
                              RICHARD P. ORMOND

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3 -1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

American LegalNet, Inc.
www.FormsWorkflow.com

Jeffrey K. Garfinkle (SBN: 15349)
Richard P. Ormond (SBN: 207442)
Matthew L. Seror (SBN: 235043)
BUCHALTER NEMER
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA  90017-2457
Tel: (213) 891-0700; Fax: (213) 896-0400
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOINT EQUITY COMMITTEE OF INVESTORS OF REAL ESTATE PARTNERS, INC., AND ITS RELATED ENTITLES<br><br>PLAINTIFF<br><br>V.<br><br>DAWSON L. DAVENPORT<br>[See Attached "Schedule A"]<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**CV08-08551 SJO (RNBx)**<br><br>---<br><br>**SUMMONS** |

TO:DEFENDANT(S): DAWSON L. DAVENPORT, an individual; THOMAS THOMPSON, an individual; MICHAEL P. OWENS, an individual; DONALD G. RYAN, an individual; JOHN ITZEL, an individual; ROURKE OAKLAND, an individual; JAIRAM PAI, an individual; BRENT PAYNE, an individual; ROBERT WARREN, III, an individual; THE ESTATE OF KEVIN RUSSELL, a deceased individual; GREGORY SMITH, an individual; BOWEN JONES, an individual; GREG GARMON, an individual; RANDAL MATSON, an individual; THOMPSON REAL ESTATE GROUP, a California corporation; PINE MOUNTAIN CORPORATION, a California corporation; NETWORK REAL ESTATE, a California corporation; PRINCIPLE MANAGEMENT GROUP, a California corporation; R.W. MATSON, INC., a California corporation; REAL ESTATE PLACEMENT, INC., a California corporation; TKJ, INC., a California corporation.  A lawsuit has been filed against you.

   Within 20 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _____, whose address is _____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.


                                                    Clerk, U.S. District Court

Dated: DEC 2 4 2008                            By: _____
       _____                      Deputy Clerk

                                                    *(Seal of the Court)*


*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

American LegalNet, Inc.
www.USCourtForms.com

# "SCHEDULE A"

JOINT EQUITY COMMITTEE OF INVESTORS OF REAL ESTATE
PARTNERS, INC., AND ITS RELATED ENTITIES

Plainitiff,

vs.

DAWSON L. DAVENPORT, an individual; THOMAS THOMPSON,
an individual; MICHAEL P. OWENS, an individual; DONALD G. RYAN,
an individual; JOHN ITZEL, an individual; ROURKE J. OAKLAND,
an individual; JAIRAM PAI, an individual; BRENT PAYNE, an individual;
ROBERT WARREN, III, an individual; THE ESTATE OF KEVIN
RUSSELL, a deceased individual; GREGORY SMITH, an individual;
BOWEN JONES, an individual; GREG GARMON, an individual;
RANDAL MATSON, an individual; THOMPSON REAL ESTATE
GROUP, a California corporation; PINE MOUNTAIN CORPORATION,
a California corporation; NETWORK REAL ESTATE, a California
corporation; PRINCIPLE MANAGEMENT GROUP, a California
corporation; R.W. MATSON, INC., a California corporation;
REAL ESTATE PLACEMENT, INC., a California corporation;
TKJ, INC., a California corporation and DOES 1-100